IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


GERALD KEEHN,                          )
                        Plaintiff      )
                                       )
        vs.                            )        Civil Action No. 09-16
                                       )        Magistrate Judge Bissoon
C/O LUCAS; C/O CHIPIKITAS; C/O         )
ELSTNER; FORMER SUPERINTENDENT)
HARRY E. WILSON; CAPTAIN               )
McCOMBIE; LT. TKACS. SGT. HOGAN;  )
C. SHAFFER, Control Sgt.; C/O          )
DELBRIDGE,                             )
                        Defendants     )

## MEMORANDUM AND ORDER

## I. MEMORANDUM

Gerald Keehn ("Keehn" or "Plaintiff"), a former inmate at the State Correctional

Institution in Fayette, County, Pennsylvania ("the Prison") filed this action pursuant to 42 U.S.C.

§ 1983, alleging violation of his rights under the United States Constitution and related state law

claims.  In Count I of the six count Amended Complaint (ECF No. 17), Plaintiff alleges that

corrections officers Kenneth Lucas ("Lucas") and Jeffrey Chipikitas ("Chipikitas") used

excessive force against him in violation of the Eighth Amendment[1] when they slammed his head

into a wall, held him in place, and shocked him repeatedly with an electronic body

immobilization device ("EBID").  Officer Kenneth Elstner ("Elstner") is alleged to have

---

[1]Keehn also alleges violation of the Fourteenth Amendment, but does not elaborate on that claim
in the Amended Complaint or in his brief.  The Plaintiff does not allege that he was a pretrial detainee at
the time of the incident.  Had he been, he would have been subject to Fourteenth as opposed to Eighth
Amendment protection.  Convicted inmates are subject to the Eighth Amendment.  This is because
sentenced prisoners are protected from only punishment that is "cruel and unusual," while pretrial
detainees are protected from any punishment.  See Hubbard v. Taylor, 399 F.3d 150, 166-67 (3d Cir.
2005).  In either case, the "deliberate indifference" standard applies.

transgressed the same right by failing to intervene to stop the attack. Count II focuses on the conduct of former Prison Superintendent, Harry E. Wilson ("Wilson"), alleging that Wilson's failure adequately to supervise, train and discipline corrections officers with a history of assaulting prisoners constituted deliberate indifference to Keehn's Eighth Amendment rights. In addition, Keehn alleges that Wilson acted with deliberate indifference in failing to implement adequate screening procedures for hiring and supervising corrections officers, to establish, maintain, and enforce adequate staffing, and to enforce policies regarding key control. In Count III, Keehn contends that Captain William McCombie ("McCombie"), Sergeant Daniel Hogan, [2] and Lieutenant Michael Tkacs ("Tkacs") violated his rights under the Eighth and Fourteenth Amendments by failing adequately to supervise Lucas, Chipikitas and Elstner, failing to secure weapons at the Prison, and failing to ensure that the unit in which Keehn was housed was adequately staffed. Counts V and VI [3] set out state law assault and battery claims against Lucas and Chipikitas, and intentional infliction of emotional distress claim claims against Lucas, Chipikitas, and Elstner.

The Court addresses here the pending Motion for Partial Summary Judgment (ECF No. 36) filed on behalf of Defendants Wilson, McCombie, and Tkacs. The Motion will be granted in its entirety.

## BACKGROUND

The events underlying this suit took place on August 20, 2007, when Keehn was

---

[2] Plaintiff does not dispute that Hogan is entitled to summary judgment.

[3] Count IV asserts claims against Sergeant Curtis Shaffer and Corrections Officer Delbridge. Because Keehn agrees that summary judgment is appropriate as to these Defendants, the Court does not detail the allegations against them. (ECF No. 42 Ex. 41).

incarcerated in Administrative Custody ("AC") status in the L-Unit, C-Pod, of the Prison's

Restricted Housing Unit ("RHU"). (ECF No. 17 at ¶ 13; ECF No. 37 at ¶9). [4] He was assigned

to AC at his own request because of a confrontation with other inmates in the Prison's general

population. (Id. at ¶ 11). At the time, Wilson, the Prison Superintendent, was responsible for

managing and supervising staff in the day to day operation of the institution. (ECF No. 37 at ¶¶

12-13). McCombie, a Prison Captain, was shift commander on the 2:00 p.m - 10:00 p.m. shift,

working out of the Prison's main control room. (Id. at ¶¶ 20-22). Tkacs was the RHU

Lieutenant assigned to the L-Unit on the same shift. (Id. at ¶¶ 23-24).

About a month prior to the incident, Keehn became a block worker for J-Block,

performing work seven days per week under the supervision of corrections officers. (ECF No. 38

Ex.5 at 11). He spent most of each day out of his cell performing duties including cleaning,

packing essentials for other inmates, and handling request slips and grievances. (Id. at 10,

11,12). Keen alleges that two days prior to the events at issue, he asked Elstner if he could

borrow a television, because the one in his cell was "on the fritz." (Id. at 14). Keehn contends

that in the evening of August 20, 2010, when he returned to his cell on L-Block after finishing

his work on J- Block, the following events transpired:

> I came back in with the other block worker. Lucas stopped me by
> the sergeant's bubble and said, do you want to borrow a TV? I said
> yeah. He said wait here. He goes into the control room. He's in
> there maybe a minute, two minutes, comes back out and says,
> follow me. We walked around his right side. He goes in the
> armory and says, stay here. I stood there at the armory. He was
> gone maybe another minute, two minutes. He comes back out. He

---

[4]The RHU "provided closer supervision and control for inmates assigned to administrative or
disciplinary custody status. [These inmates] are generally confined to their calls except for daily
exercise, showers and [visits to the] law library." (ECF No. 38 Ex. 3 at ¶ 4).

says, follow me.

> We went to D Pod where we met up with CO Elstner and the other block worker . . . We went upstairs on D Pod. We went in the back room. CO Lucas asked Elstner if he had the keys to the [property room] door. Elstner opened up the door for us. We went in, and we was asking if he had the TV. We looked for the TV. It wasn't in that room. So Elstner and [the other block worker] left. They came back in with the TV.

\

> Elstner set the TV up on the desk. We're trying to get it to work . . . I asked CO Elstner, are we done, and he said yeah.

> Then CO Lucas said, well, not yet. He said either I was going to give them all a blow job or get tasered . . . And I looked at him. I was like, tasered? And he pulled the taser our of his pocket. And I go, I'm cool. I'm good. I go to walk out of the room, and CO Chipikitas was walking in as I was about to leave. And he's like, where are you going, convict? And he started to laugh. I was like, I'm out of here. He pushed me back in the room. When he pushed me back, CO Lucas grabbed the back of my jumpsuit that I had tied around and pushed me over to the wall.

> And from what I could see Chipikitas was on my left side; Lucas was on my right. And Chipikitas had his arm on my left side holding me against the wall. Lucas had his left hand on my shoulder, and I got tasered.

(Id. at 12-13). The transcript of Keehn's deposition then reflects the following exchange:

> Q.    Do you know how many times?
>
> A.    Three
>
> Q.    On your right? Chipikitas was on your-
>
> A.    Left.
>
> Q.    – left? And they were holding you against the wall?
>
> A.    Wall.
>
> Q.    As they were holding you that's when you were struck with the EBID?
>
> A.    Well, Lucas let go of me when he tasered me, but Chipikitas still had a hold of me on my left side. And he jumped back,

4

and Lucas tasered me two more times.

Q.     And then what happened?

A.     After the third time I fell to the floor.  I got up, and I lost
       control of my bowels and I urinated on myself.  They
       laughed.  As I was walking toward the desk because there's
       [a] chair at the desk, I went to sit down, and Lucas hands me
       the TV and said, keep your mouth shut, thanks for
       participating in our little experiment.

Q.     Then what happened?

A.     Elstner left.  Lucas left.  Me - - not Elstner, but Chipikitas
       and Lucas left first.  There's me, Elstner and [the other
       inmate] left.  I picked the TV up, walked outside on the
       catwalk and went to my cell.

(Id. at 13).

       The next day, Keehn completed a sick call slip stating that he had been tasered by guards,

and that the resulting welts appeared to be infected.  (Id. at 14).  On August 22, a physician's

assistant examined him through the door of his cell, stating that the welts did not seem to be

infected and were healing.  (Id. at 15).  Keehn then wrote a letter to Wilson, and filed a grievance.

Two Lieutenants visited Keehn three or four days after the examination by the physician's

assistant, and a nurse photographed the marks on Plaintiff's right side.  (Id. at 16).

       Lucas ultimately was terminated from his position, and faced criminal charges, to which

he pled guilty.  (ECF No. 17)[5].   Elstner received a single day suspension for failing to report the

_____

       [5]According to Lucas, during the 2:00 - 10:00 p.m. shift on August 20, 2007, he took armory keys
from the L-5 control booth, went to the armory, and removed an EBID. (ECF No. 37 at ¶34).  On the
pretense of securing a television for Keehn's use, he then went with Keehn and another inmate to the
property room on the second level of D-Pod, a room lacking a security camera, where he used the EBID
against Keehn. (Id. at ¶ 36). He states that did this at Keehn's request, so that Keehn could settle an
argument with his cellmate regarding the physical effect of an EBID. (ECF No. 38 Ex. 6 at 25-26).  Lucas
testified at his deposition that afterward, he gave Plaintiff a television  so that "maybe he wouldn't say

incident.  Chipikitas was not disciplined.  (ECF No. 37 at ¶ 39).

The allegations made against Defendants Wilson McCombie and Tkacs focus on their failure to establish and maintain "systems and procedures governing access to weapons in the L-5 armory," and "to ensure that corrections officers on the L-5 Unit were adequately monitored[,] supervised and . . . staffed."  (ECF No. 42 at 6).   Keehn also alleges that Wilson failed adequately to screen Lucas during the hiring process. (Id.).

## STANDARD OF REVIEW

Summary Judgment is appropriate only where there are no genuine issues of material fact. Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). While the moving party must demonstrate the absence of any genuine factual dispute, Celotex Corp. v. Catrett, 477 U.S. 317, 323(1986), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.  . . .  [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 586-87 (1986) (emphasis in original removed).

In evaluating the evidence, the Court must view the facts and the inferences to be drawn therefrom in a light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.   At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Anderson, 477

anything." (Id. at 26).  Elstner contends that he was present when Lucas used the EBID on Keehn, but believed that Keehn was a willing participant.  (ECF No. 43 at ¶ 19).  Chipikitas testified at his deposition that he did not enter the room until the incident was over. (Id. at ¶ 14).

6

U.S. at 249. When examining the record to see if there are genuine issues of material fact, the Court's focus is on issue finding, not on issue resolution.

## ANALYSIS

In order to establish a section 1983 claim, a plaintiff must show that the defendant acted under color of state law, and that Plaintiff was deprived of a federal constitutional right. Because there is no dispute that Defendants were state actors, the Court's focus is on whether Wilson, McCombie, or Tkacs transgressed Keehn's constitutional rights. Because none of these Defendants is alleged to have planned or participated in the alleged attack, Keehn relies on the principle of supervisory liability.

In order to survive summary judgment on a claim of supervisory liability under the Eighth Amendment, a plaintiff must point to evidence showing: "(1) the existence of a policy or practice that created an unreasonable risk of an Eighth Amendment violation; (2) the supervisor's awareness of the creation of the risk; (3) the supervisor's indifference to the risk; and (4) that Plaintiff's injury resulted from this policy or practice." Estate of Chance ex rel Humphreys v. First Corr. Med., Inc., No. 08-4220, 2009 WL 1758830 at * 3 (3d Cir. June 23, 2009) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989). "[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir.1987).[6] See also Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 2008)

---

[6]All of Defendants are sued in their individual and official capacities. To the extent that Keehn seeks monetary damages from Defendants in their official capacities, his request for relief is dismissed. See Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (states, their agencies, and their employees are not, in their official capacities, "persons" subject to suit under 42 U.S.C. § 1983).

(reiterating that respondeat superior liability is not available under section 1983).

It is essential that a plaintiff show that any indifference to his rights was deliberate.

Granberry v. Chairman of Pa. Bd. of Prob. and Parole, No. 10-1514, 2010 WL 3899634 at * 3 (3d

Cir. Oct. 6, 2010) (citing Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)). "To act with deliberate

indifference is to recklessly disregard a substantial risk of serious harm." Id. (citing Farmer v.

Brennan, 511 U.S. 825, 836 (1994)). The deliberate indifference determination is a subjective

inquiry, Farmer, 511 U.S. at 837, and "the standard by which a supervisor is held liable in [his]

individual capacity for the actions of a subordinate is extremely rigorous." Cottone v. Jenne, 326

F.3d 1352, 1360 (11th Cir. 2003).

In order to establish Defendants ' liability, Keehn makes a number of claims, all involving

policy or custom. As the Court of Appeals for the Third Circuit has explained:

> [There] are three situations where acts of a government employee
> may be deemed to be the result of a policy or custom of the
> governmental entity for whom the employee works, thereby
> rendering the entity liable under § 1983. The first is where the
> appropriate officer or entity promulgates a generally applicable
> statement of policy and the subsequent act complained of is simply
> an implementation of that policy. The second occurs where no rule
> has been announced as policy but federal law has been violated by
> an act of the policymaker itself. Finally, a policy or custom may
> also exist where the policymaker has failed to act affirmatively at
> all, [though] the need to take some action to control the agents of
> the government is so obvious, and the inadequacy of existing
> practice so likely to result in the violation of constitutional rights,
> that the policymaker can reasonably be said to have been
> deliberately indifferent to the need.

Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (internal citations

omitted). See also Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir. 2007). A

custom is distinct from a policy; it is created by a state official's course of conduct which, though

not authorized by law, has become "so permanent and well settled" that it operates as law.  Id. (citation omitted).  "In either instance, the Plaintiff[ ] ha[s] the burden of showing that a government policymaker is responsible for acquiescence to the policy or custom," id. (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990), and for establishing a "direct causal link between a municipal policy or custom and the alleged constitutional violation." City of Canton v. Harris, 489 U.S. 378, 385 (1989).

### A.    Count II - Claims Made Against Former Superintendent Wilson

Keehn's claims against Wilson are as follows:

> 1.    The failure to screen prospective corrections officers in general, and the application of Lucas in particular[7]

The essence of this claim is "that a single facially lawful hiring decision [launched] a series of events that ultimately caused a violation of federal rights." Bd. of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 405 (1997).  Such claims "present difficult problems of proof." Id. at 406.  "To prevent municipal liability for a hiring decision from collapsing into respondeat superior liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." Id. at 410.  A single instance of inadequate screening is not enough to establish deliberate indifference.  As the Supreme Court has stated:

> Inadequate screening of an applicant's record may reflect "indifference" to the applicant's background.  For purposes of a legal inquiry into municipal liability under § 1983, however, that is not the relevant "indifference." A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow

---

[7]Although in the Amended Complaint, Keehn alleges that Wilson failed properly to screen the applications of Chipikitas and Elstner, Plaintiff's brief fails to address this allegation, and he does not point to evidence showing irregularity in the screening or hiring of either.

9

the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference"

(Id. at 411).

The record shows that when Lucas was hired, Wilson was responsible for overseeing the hiring process. (ECF No. 38 Ex. 12 at 7). That process was initiated by an applicant's completion of the Civil Service Examination. When there was an opening at the Prison, the Prison's human resources ("HR") personnel would contact the Civil Service Commission for a list of interested candidates. (ECF No. 38 Ex. 12 at 11). Interviews followed. According to Wilson: "Typically, [the interview would be conducted by] somebody from personnel and a management representative from the Department that they're interviewing for. It's a correction officer that's being hired. It might be an HR person and a [ranking corrections officer] that would do the interviews or unit manager and HR." (Id.). Following the interview, physical and psychological screening were done regionally, and medical screening was conducted at the Prison. (Id.). Wilson did not personally review all applications. "It would depend on the time. There were times when we were hiring . . . fifty people a week, especially for corrections officers. So the other people below me would have been scrutinizing the application." (Id. at 15).

Plaintiff argues that Lucas's application should have been red-flagged as problematic for several reasons. First, in 2003, Lucas was terminated from a position with the Commonwealth's Department of Transportation. (Id. at 13). Wilson said that he had never seen the termination letter, but assumed that it had been available in the hiring process. He stated that "apparently whoever made the decision to recommend him to me didn't feel like this was significant enough

not to hire him." (Id. at 14).

Keehn next addresses a section of Lucas's application indicating that he had been charged in Greene County for kidnaping, unlawful restraint, simple assault and harassment, and had a Protection From Abuse Order with a firearm restriction entered against him.  (Id.)  In Fayette County, he had faced charges for trespass and harassment.  (Id.).  Wilson testified that this information would have been reviewed during the course of the interview process: "This had to have been looked at because [Lucas] had to have [the firearm restriction] lifted because to be successfully hired, he would have had to [have] gone through the training academy which requires the use, qualification of the firearm."  (Id. at 15).  Wilson then reemphasized that one of the first things that the Interview Committee examines is a candidate's criminal record.[8]  "At the minimum, they would have required the candidate to account for this verbally at the interview. And if the accounting was satisfactory, then the person could be hired."  (Id. at 16).

The record reflects that a criminal records search was done on Lucas, that Wilson or the Prison Deputy saw the results of that search, and that Lucas's criminal history was sent to the Central Office on May 16, 2005  for review.  (Id. at 17).  On July 11, 2005, Lucas began work at the Prison as a corrections office trainee.  (Id. at 21).   In this initial phase of his employment, Lucas did not have contact with inmates.   According to Wilson, "In phase one you're not around inmates unless you're with other staff or you're at basic training.  Like I said, the phase one is primarily a shadowing-type of experience and basic training . . . I think basic training is five

---

[8]In his deposition, Lucas testified that prior to the time he was hired, he was interviewed and questioned about his criminal record.  He explained that the Greene County charges had been withdrawn, and that in Fayette County, he pled guilty to a summary harassment offense. The interviewing committee did not indicate to Lucas that these events precluded his being hired.  Lucas's account of the disposition of these charges is undisputed.

weeks." (Id. at 20). The State Police criminal history results verifying that the felony charges against Lucas had been withdrawn was received at the Prison on August 10, 2005, while Lucas was still in the training phase. (Id. at 21).

According to Keehn, this evidence "would permit a jury to find that Defendant Wilson was deliberately indifferent to the need for adequate screening procedures for CO's, because he failed to establish and maintain procedures which would have identified Lucas's criminal background as problematic." (ECF No. 42 at 21-22). The Court disagrees. The record shows that Lucas's criminal charges *were* identified during the hiring process. He was examined about those charges, and explained that except for one summary offense, to which he pled guilty, the charges had been withdrawn. The state police record, although it arrived after Lucas had been hired and did not mention the summary offense, confirmed Lucas's account of the remaining charges. Thus, the process in place uncovered Lucas's criminal history, and a determination was made that it did not preclude employment.

Even if the Court were to assume that the delayed receipt of the state police document rendered the assessment of Lucas's background inadequate, "this showing is not enough to establish 'deliberate indifference.'" Bryan County, 520 U.S. at 411. The law is clear that a finding of an Eighth Amendment violation based on inadequate screening:

> Simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that this officer was highly likely to inflict the particular injury suffered by Plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong.

Id. at 412. The critical inquiry, then, is "whether [Lucas's] background made his use of excessive force . . . a plainly obvious consequence of the hiring decision." Id. It did not. The Supreme

Court's evaluation of the record in <u>Bryan County</u> applies with equal force here:

> The fact that [Lucas had been charged with a felony and] pleaded guilty to [another] misdemeanor[ ] may well have made him an extremely poor candidate for [corrections officer]. Had [Wilson] fully reviewed [Lucas's] record, he might have come to precisely that conclusion. But unless he would necessarily have reached that decision because [Lucas's] use of excessive force would have been a plainly obvious consequence of the hiring decision, [Wilson]'s inadequate scrutiny of [Lucas's] record cannot constitute "deliberate indifference" to [Plaintiff's] federally protected right to be free from a use of excessive force.

(<u>Id.</u> at 415).

### 2. The failure to institute a policy or custom with respect to corrections officers known to have assaulted inmates

Keehn alleges that prior to the EBID incident, Lucas had "been involved in one or more assaults on inmates at SCI-Fayette," (ECF No. 17 at ¶ 60), and that Wilson failed "to establish or maintain a policy, practice, or custom of monitoring, supervising, training, retraining and disciplining corrections officers such as Defendant Lucas, who had been involved in assaults on inmates." (<u>Id.</u> at ¶ 63). According to Keehn, this "failure" created an unreasonable risk that Lucas would continue to assault inmates. This argument is not addressed in Plaintiff's brief. Moreover, Keehn fails to point to evidence supporting it. The Court has combed the record for references to Keehn's assault on an inmate prior to August 27, 2007. At his deposition, Lucas testified that in June 2007, he conducted a pat down of another inmate who subsequently filed a grievance alleging that Lucas had improperly touched his genitals. (ECF No. 38 Ex.6 at 51). This grievance was investigated and determined to be unfounded. No disciplinary action was taken, and there is no evidence that Wilson was made aware of the allegation. In short, Plaintiff has not identified any aspect of Lucas's conduct as a corrections officer that would have put Wilson on notice that

Lucas required additional monitoring, supervising, training, retraining or discipline in connection with any of his job responsibilities.

3.     <u>The failure to establish, oversee and enforce policies and procedures governing the management, access, and control of all weapons at SCI-Fayette</u>

This argument is based on L-5 key control. It is undisputed that within the L-Unit in the Prison's RHU, there was an armory in which custodial weapons including handcuffs, shackles, tethers, and batons were stored. (ECF No. 38 Ex. 9 at 27). Inside that armory was a padlocked four foot square steel box containing pepper spray, a handheld EBID, and a shield EBID. (<u>Id</u>. at 20). The general practice was for staff members to access the armory by taking keys from the box in the L-5 Control Room where all the keys, including those for the armory, and the box, were kept. (<u>Id</u>. at 21). "Proper procedure [would have been] to let the Control Officer know that you were going to drop keys. On his key ring, in the control key ring, he had a key to that box. He would open the box, issue you the keys. You would give them to him, and he would hand it on the key ring and then resecure the box." (<u>Id</u>. at 21). This procedure was not generally observed.

In practice, "[t]he box [was] left open, and if you wanted a set of keys, you walked up there, opened the door, grabbed the keys and left. Took the keys back there and roll[ed] out." (<u>Id</u>.). When the keys were removed, the officer responsible would place an identifying chit on the empty key hook, so that anyone checking the box would know who had the keys. (<u>Id</u>. at 22). The L-5 Sergeant was responsible for inventorying items in the Armory at the beginning and end of each shift, and indicating on an inventory record that he had done so. (<u>Id</u>. at 27). He could, though, delegate this duty to a corrections officer. (<u>Id</u>. at 28). The L-5 Lieutenant was responsible for ensuring that the Sergeant conducted this inventory, although he did not do so every day. (<u>Id</u>.).

There was no procedure in place for a mid-shift inventory.  (Id. at 28).  "So long as the items were back at the end of the shift, then the report was complete and there was no problem." (Id.).  The EBID was not listed on the inventory sheet.  (ECF No. 38 Ex. 11 at 31).  The interior of the armory was not monitored by a security camera.  (Id. Ex. 9 at 29).

Defendant Tkacs, the L-5 Lieutenant, was aware of the open box policy before August 2007.  (Id. Ex. 11 at 34).  When asked when he had learned that proper procedure was not being followed, he answered:  "A day.  I don't know.  There've been times when people would come for inspections and it's been open, and I've been told about it."  (Id. at 22).  Department of Corrections  ("DOC") Policy mandated that as part of an Annual Operations Audit, a Security Inspection Team inspect the Prison's armory.  (ECF No. 42 Ex. 14 at 34-12).  Wilson testified that annually, high security staff from other facilities, plus Central Office staff conducted an overall Prison inspection.  They "would evaluated inventories, key control, armory, the whole nine yards . . .  And then any deficiencies are reported out and then you have 30 days to put in a plan of action for a corrective action." (ECF No. 38 Ex. 11 at 34).

The record  evidence pertaining to Wilson's knowledge of deficiencies in procedures governing weapons access on L-5 at the time of the alleged assault is scant.  Although annual facilities inspections of the Prison's armory were required - -and apparently done - - by the DOC, it is not clear that these inspections included the L-5 armory. The results of these inspections are not included in the record.  Moreover, the record does not show that Wilson was ever notified of shortcomings in or deviation from established policy in the area of weapons access in either armory.  Although Tkacs testified in his deposition that he had been "told about" the open box policy at inspections, he was never asked to identify who conducted the inspections, whether he

was familiar with the results, or whether those results were communicated to Wilson. Finally, the record does not establish that there had been a prior incident where it was alleged or was obvious that the de facto key policy resulted in the violation of an inmate's constitutional rights. Thus, there is no pattern of injuries suggesting Wilson's deliberate indifference to a known risk. At his deposition, Wilson testified :

> Q. Prior to this incident in August of 2007, did it ever come to your attention that there was a problem with the minor [sic] in which keys were being kept or stored or inventoried in the L-5 Unit?
>
> A. No. In fact, we didn't clear the annual operations inspect for key control on all the years that I was there and I don't know that there was a problem.
>
> Q. Did it ever come to your attention that there was an issue with corrections officers in the L-5 Unit going into the armory taking out weapons or any other devices without the knowledge or permission of their supervisors?
>
> A. No. That was never brought to my attention ever before or subsequent to this, I might add. And that's taboo and would not have been condoned or it would have been dealt with.
>
> Q. And I believe you indicated that within your tenure at SCI-Fayette, this was the only incident where you were aware that an officer had gone into the armory, taken out an EBID and used it on an inmate without the knowledge, permission or authorization of his supervisor?
>
> A. Yes.

(ECF No. 38 Ex. 11 at 41).

It is clear that the system being used for L-5 key access was imperfect. If, per official policy, keys had been available only from the officer in charge, an additional level of security would have been built into the system for accessing weapons. This is not to say, though, that the

16

system as it functioned was constitutionally deficient. A corrections officer was always stationed in the locked area where the key box was located. (Id. Ex. 6 at 25). The use of chits ensured a means of identifying at any given time which officer had possession of the L-5 armory keys. See City of Canton, 489 U.S. at 392 (1989) (noting that while it may be possible to "point to something [that] 'could have been done' to prevent the unfortunate incident," this alone does not show deliberate indifference).

4.        Failure to Conduct Adequate EBID Safety Training

To establish a section 1983 claim based on failure to train, "[i]t is not enough for a plaintiff to argue that the alleged injury would not have occurred if the supervisor had 'done more.' He must identify specific acts or omissions of the supervisor that evidence deliberate indifference and establish a link between the act or omission and the ultimate injury." Diaz v. Carroll, 570 F.Supp.2d 571,577 (D.Del. 2008) (quoting Brown, 269 F.3d at 216).

Keehn argues that officers in the L-5 Unit were inadequately trained in the use and safety aspects of EBIDs, and that Wilson's failure to mandate more comprehensive training violated the Eighth Amendment. In his deposition, Wilson testified that EBID use was covered in the DOC Use of Force Policy. (ECF No. 38 Ex. 11 at 30-31). The training in the proper use of force covered how and when to use the EBID. "An officer [did] not have the authority to just go pull it out." (Id.).

Lucas testified that he received this training, and was certified in the use the use of EBIDs, first at the Academy, and then in yearly refresher courses. (ECF No. 36 Ex.6 at 18). He had used the device on himself, applying current for about six or seven seconds. (Id.). He was taught where the instrument was not to be used, such as in the eyes, on the heart, or on persons with

certain medical conditions, such as pacemakers. (Id. at 41). He did not receive a safety handbook or an instruction manual. (Id at 18). The written materials he was given covered when to use EBIDs as part of his job, and where the use of an EBID fell on the use of force continuum. (Id.).

Elstner testified that he received training in how to use the EBID "in Elizabethtown." (ECF No. 38 Ex. 7 at 68). He did not know that the term EBID stood for. He knew that it delivered a shock, and, in learning how to operate the device, he had received and administered shocks to his own body. (Id. at 69). Although Elstner testified that the EBID "only stays on for so many seconds," he could not say how many. (Id. at 70). He did not recall receiving an instruction manual or written safety instructions, nor had he seen these materials anywhere at the Prison. (Id. at 72 -74). Elstner could not say how many volts were emitted by the EBID. (Id. at 73).

Chipikitas had similar yearly EBID training as part of the overall training in use of force. (ECF No. 38 Ex. 8 at 27). He remembered receiving safety instructions such as limiting application of an EBID to fifteen seconds, not using the instrument in the area of the groin, and not getting it wet. (Id.).

Keehn's primary argument is that the EBID training given to corrections officers was inadequate in the context of the Eighth Amendment because written safety information was not provided as part of the training or made available in the L-5 armory. The law fails to support his theory. The Supreme Court has clarified that in resolving an issue of supervisory liability for failure to train:

> [T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [supervisor], for the officer's shortcomings may have resulted from factors other than a faulty training program . . . Neither will it suffice to prove that an injury or accident could

> have been avoided if an officer had had better or more training . . .
> Moreover, for liability to attach . . . the identified deficiency in a
> city's training program must be closely related to the ultimate
> injury.

Id. at 390-91.

Nothing in the record indicates that any aspect of the alleged assault upon Plaintiff or the use of an EBID on any other Prison inmate resulted from the lack of safety instructions. There is, therefore, at best, a tenuous connection between the failure to maintain written safety information in the L-5 armory, and Lucas's decision to use the weapon in a manner that clearly -- under any version of the facts -- failed to comply with the instruction he had been given. If Lucas was not deterred by what he already knew about the weapon and the protocol for its use, it is highly unlikely that his behavior would have been different had been able to access a safety manual.

### 5. Inadequate Staffing on the Night of the Incident

Keehn next alleges that Wilson failed "to establish, maintain, and enforce policies and procedures requiring adequate staffing and supervision " at the Prison. (ECF No. at ¶ 131). Specifically, Keehn refers to the fact that on the night of the incident, Sergeant Hogan, who suffered a lacerated cornea in the early hours of the shift, and was forced to leave the Prison to seek medical attention, was not replaced. (ECF No. 38 Ex. 3 at ¶¶ 2,5,7,8). The Sergeant was the primary Unit supervisor, and was responsible for allocating duties to the corrections officers, and ensuring that the shift ran smoothly. Next in seniority was Tkcas, the L-5 Lieutenant. He would have been responsible for requesting a replacement for Hogan, and would have done so through the Scheduling Lieutenant. (Id. at 20). Often, there was no available replacement, and the Unit would "run short." (Id. at 12).

McCombie, a Captain and the shift commander for the 2:00 p.m. - 12:00 p.m. shift on

August 27, 2007, (ECF No. 38 Ex. 10 at 8), was responsible for all staff on that shift, making sure that all Units, including the L-5, ran smoothly and that all duties were completed. He does not remember being notified that Sergeant Hogan had left the Prison. (Id.. at 19).

The record as it stands does not establish any basis upon which Wilson could be held liable under the Eighth Amendment for inadequate staffing of the L-5 Unit on the night that Keehn was assaulted. Plaintiff does not point to evidence demonstrating that shift staffing was regularly affected by an officer's need to leave the Prison and the inability to replace him. He also fails to point to evidence showing that Wilson knew that Hogan left on the night of August 20, 2007, or that he was not replaced. In addition, the record fails to document a pattern of misconduct -- on the L-5 Unit or elsewhere -- associated with short staffing. Consequently, he could not have been aware of any risk associated with Hogan's absence, and could not have been deliberately indifferent to that risk.

6.      The Failure to Provide Specialized RHU Staff Training

The record fails to show a pattern involving constitutional violations on the part of RHU staff, and contains nothing to support the proposition that the lack of RHU training  - in addition to use of force and general on-the-job training -  posed a substantial risk of constitutional harm. Furthermore, Plaintiff has failed to identify evidence showing that the lack of specialized training was the cause underlying his injury.

7.      Failure to Track Complaints of Inmate Abuse

Keehn alleges that aspects of policy in place for reporting inmate abuse contributed to the violation of his Eighth Amendment rights. First, he states: "There is no system for tracking inmate complaints about CO abuse." (ECF No. 42 at ¶ 95). In fact, however, Wilson testified in

some detail that there was a system for "tracking those types of incidents." (ECF No. 38 at 27). "[I]t would have been grievances where, you know, if your name popped up for using abusive language, or physical harassment or any number of other types of grievances, that grievance tracking would evaluate that. Like you said, certain individuals' names would pop up more often then [sic] it should." (Id.). Keehn described "a department-wide analysis" and "specific statistics for the facility." (Id. at 28). He testified that when a name seemed to come up more often than would be expected, he "would contact the deputy and ask them to explain that and follow up on it and ascertain why this is happening and if we need to take any corrective action." (Id.).

Keehn next alleges that the grievance procedure -- although it was effective in addressing his contentions -- was alone inadequate to protect inmates from abuse because, among other things, it was not supplemented by a mechanism granting corrections officers anonymity in reporting inmate abuse by other officers. Even assuming that an Eighth Amendment right is implicated by the alleged deficiencies in the inmate abuse reporting system, the requirements for supervisory liability under the Eighth Amendment have not been met. Although it is difficult to quarrel with the proposition that an anonymous procedure for reporting officer abuse of inmates might be a good thing, this is not the same as concluding its absence amounts to a constitutional deficiency. The record does not show that inmate abuse was a widespread problem at the Prison, nor does it support the proposition that Wilson knew that the problem was being under reported or that lack of anonymity in the reporting process created an excessive risk. [9]

---

[9]Chipikitas testified that officers were under a duty to report unusual occurrences: "There's an actual book that, you know, addresses that." ( ECF No. 38 Ex. 8 at 30). He also testified that he had reported misconduct on the part of another officer that was unrelated to abuse of an inmate. (Id.). Chipikitas recognized that there were "serious implications for telling on somebody else," and that other officers could "make your life miserable" as a result. (Id. at 31). He went to say, though, that in spite of this, he would report another officer "again if the situation was needed. I've done it before, and I'll do it

**B.     Count II - Claims Against McCombie** [10]

    1.     Failure to Supervise and Failure to Remedy Inadequate Staffing

In August 2007, McCombie held the rank of Captain. For most of his regular 2:00 p.m. - 10:00 p.m. shift, McCombie, whose duty was that of Shift Commander overseeing the entire Prison operation, worked out of Main Control: he did not have an office on any of the Prison units, including the L-5. (ECF No. 38 Ex. 10 at 8, 13). As Shift Commander, McCombie was high on the hierarchical chain of command. Directly under him were the Lieutenants, including Tkacs.-5 (Id.). The Lieutenants, who acted as intermediaries between McCombie and the line staff, were responsible for making sure that their units "ran and all the duties were completed." (Id. at 9, 30). McCombie had no direct role in hiring, assigning, or managing the L-5 corrections officers. Oversight was provided by the Lieutenants. (Id. at 10). If there was a problem anywhere in the institution, McCombie was notified via land line or radio, most often by a Lieutenant. (Id. at 14). There is no evidence showing that McCombie was notified of a problem on the night of the incident, including the fact that the assigned L-5 Sergeant had left the Prison due to a medical emergency. The L-5 Sergeant was the lead hands-on worker supervising the L-5 corrections

---

again if I witnessed it, you know." (Id. at 32).

    [10]Keehn alleges that both McCombie and Tkacs bear responsiblity for a number of other deficiencies in administration. These included the fact that corrections officers on the L-5 Unit do not have specific assignments for a particular shift, but decide informally with the L-5 Sergeant who will perform the various required tasks, the lack of specialized training for COs assigned to the particularly stressful L-5 environment, the lack of enhanced monitoring of COs undergoing investigation for inmate abuse, and the "perfunctory" and "shallow" nature of investigations into inmate abuse. (ECF 42 at 15-16) (record citations omitted). Keehn has not established that either of these Defendants had final policymaking authority in these areas, knew that these conditions created an excessive risk, or that the alleged deficiencies were the motivating force behind any violation of Keehn's Eighth Amendment rights.

officers.  (Id. at 29).  McCombie's interaction with the line officers took place during mandated once per shift unannounced tours of each Unit.  (Id.).  These tours could be made by the shift commander or the alternate shift commander.  On the night of August 20, 2007, the tour of the L-5 Unit was made by alternate shift commander, Lieutenant Kostingo.  (Id. at 32).  There is no evidence showing that Lieutenant Kostingo reported any irregularities on that Unit to McCombie.

The record is devoid of evidence showing that McCombie deliberately failed to supervise Defendants Lucas, Chipikitas, and Elstner, knew about any failure to supervise these officers, or that he knew about and failed to take action to replace Sergeant Hogan following his departure from the Unit.  Plaintiff has thus failed to establish that McCombie was deliberately indifferent to an unreasonable risk or an Eighth Amendment violation, or that his conduct was the "'moving force' behind the injury alleged."Bryan County, 520 U.S. at 405.

2.      Failure to Remedy L-5 Key Control Access

As the Court has already noted, Tkacs, the L-5 Lieutenant, testified that he had been told that the L-5 armory key box should not remain unlocked : "There've been times where people would come for inspections and it's been open, and I've been told about it." (Id. at 22).   Plaintiff relies on Tkacs's statement to support one of his Eighth Amendment claims against McCombie.  Keehn points to a DOC  policy requiring that a Security Inspection Team inspect each facility's armory on an annual basis.  (ECF No. 42 at 12).   Then, citing Tkacs's statement that he had been told about the open box "when people would come for inspections," Keehn states: "The evidence supports a reasonable inference that, as Shift Commander, Defendant McCombie would have been made aware of this problem as well, given his higher-ranking position." (Id. at 13).   This inference is not sufficient to allow this portion of Keehn's claim to survive summary judgment.

First, it is not clear that the "inspections" to which Tkacs refers were DOC investigations. There is no record evidence documenting when such inspections occurred or what was noted therein. Tkacs may well have referred to an internal inspection. In either case, the "reasonable inference" on which Keehn relies to establish McCombie's knowledge that proper key box procedure was not being followed is too tenuous to support Eighth Amendment liability. Proof of what a defendant might or should have known is not adequate to meet the Eighth Amendment standard. It is what the prison official *actually* knew that is critical. See Quarles v. Palakovich, __F.Supp.2d__, No. 3:07-cv-1905, 2010 WL 3168212 at *6 (M.D. Pa. August 10, 2010) (citing Beers-Capitol v. Whetzel, 256 F.3d 120, 131 (3d Cir. 2001)).

**C.    Count II -  Claims Against Tkacs**

1.    Failure to Supervise and Failure to Remedy Inadequate Staffing

The record establishes that Sergeant Hogan, was not replaced after he left the L-5 Unit on August 20 to seek medical attention. (ECF No. 38 Ex. 9 at 17). There is no evidence that Lucas took advantage of any decrease in supervision to carry out the alleged attack, or that Tkacs was aware of the risk of such an attack. Keehn does not point to evidence showing that irregularities of any type -- including inmate abuse -- had occurred on prior occasions when the L-5 Unit had "run short." There is nothing in the record to suggest that an objectively serious risk of an Eighth Amendment violation was posed by Sergeant Hogan's absence, that Tkcas was deliberately indifferent to that risk, or that the Sergeant's absence was the cause of the EBID incident.

2.    Failure to Remedy L-5 Key Control Access

The Court has carefully analyzed the record pertaining to key access, and concludes that the Eighth Amendment claim against Tkacs based on his failure to modify that policy cannot

survive summary judgment.

The control room in which the key box was located was manned and locked at all times. (ECF No. 38 Ex. 6 at 25, 43). In order to access the control room, a member of the corrections staff had to call the control officer on the radio or knock on the control room door. Only when the officer seeking access had been identified was the door "buzzed" open. (Id. at 43-44). The key box was located to the right of the door to the control room and up a set of stairs. (Id. at 44- 45). People were "constantly moving in and out of the armory. (Id. at 26). At the end of the shift, "[t]hey would do an inventory and then somebody would initial that everything was back . . . or if there was a discrepancy, they would note that." (Id.). At a given time, there was no way to tell what was in or out of the armory by looking at the inventory sheet, and there was no inventory sheet for the EBID." (Id.). An officer's metal chit left in place of the keys he had taken, though, indicated that he had entered the armory.

On the night of the incident, the control officer saw Lucas access the key box. (Id. at 44). The armory key and the key to the box inside the armory were on the same ring. Lucas took these keys, and put his metal identification chit on the empty hook, indicating that the keys were in his possession. (Id. at 25). There was a camera on the door to the armory, and the control officer could see who entered the armory by punching in the code to a specific monitor. (Id. at 49).

Although Tkacs knew that officers did not have to request a key to the main box, and that EBIDs were not specifically inventoried, the Court finds that given the other procedures in place, the risk posed by the unlocked box was not so obvious as to implicate the Eighth Amendment. The record does not show a history of unauthorized weapons access. Thus, there is nothing in the record to show that Tkacs was aware of or deliberately different to an excessive risk that a rogue

officer, whose access to the armory keys on the night of the incident was no secret, would undertake to remove an EBID from a locked box, and use it to assault an inmate. No reasonable juror considering the evidence of record could find that the unlocked key box was the motivating force behind the alleged Eighth Amendment violation.

**CONCLUSION**

Because the requisites for supervisory liability under section 1983 have not been satisfied with respect to any of the claims made against them, Summary Judgment will be granted in favor of Defendants, Wilson, McCombie, Tkacs, Hogan, Shafer, and Delbridge.

## II.     ORDER

For the reasons stated above, the Court hereby ORDERS that the Motion for Partial Summary Judgment (ECF No. 36) filed on behalf of Defendants Wilson McCombie, Tkacs, Hogan, Shafer, and Delbridge is GRANTED in its entirety. The Court also ORDERS that claims made against Defendants Lucas, Chipikitas, and Elstner in their official capacities are DISMISSED.

*s/ Cathy Bissoon*
Cathy Bissoon
United States Magistrate Judge

December 3,  2010

cc:      Counsel of Record via CM-ECF