**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

GERALD KEEHN,                  }
                                    }
             Plaintiff,        }
                                    }   No. 09-16
        vs.                   }
                                    }   Magistrate Judge Kelly
C/O LUCAS, C/O CHIPIKITAS, C/O ELSTNER,  }
FORMER SUPERINTENDENT HARRY E.      }
WILSON and JOHN AND/OR JANE DOES # 1-3,  }
*in their individual and official capacities*     }
                                    }   ***Electronically Filed.***
              Defendants.     }

**CORRECTIONS DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION *IN LIMINE* TO PRECLUDE
<u>DEFENDANTS FROM ASSERTING A CONSENT DEFENSE AT TRIAL</u>**

AND NOW, come the Defendants, Chipikitis and Elstner ("the Corrections Defendants"), by their attorneys, Scott A. Bradley, Senior Deputy Attorney General, and Gregory R. Neuhauser, Chief Deputy Attorney General, Chief, Litigation Section, and respectfully submit the following response to Plaintiff's Motion *in Limine* to Preclude Defendants from Asserting a Consent Defense at Trial (hereinafter "Motion *in Limine*"):

## I. STATEMENT OF FACTS

Plaintiff, Gerald Keehn, is a *pro se* prisoner currently in the custody of the Pennsylvania Department of Corrections ("DOC") in the State Correctional Institution at Mahanoy.  Keehn brings this action pursuant to 42 U.S.C. § 1983 against three employees of the DOC, Corrections Officers Lucas, Chipikitis and Elstner regarding events which occurred in August of 2007 and thereafter at the State Correctional Institution at Fayette ("SCI-Fayette").

Keehn has alleged that on August 20, 2007, he was subjected to an EBID attack in the D-pod Property Room in L-Unit by Corrections Officer Lucas ("Lucas") while Corrections Officers

Chipikitis ("Chipikitis") and Elstner ("Elstner") were present.  Lucas has admitted that he used the EBID against Keehn after Keehn and his cellmate had a discussion over the use of such electronic weapons and the effect they would have on a person and, specifically, on Keehn.  As this Court summarized in its opinion on a motion for partial summary judgment filed on behalf other prison administrators and officials,

"According to Lucas, during the 2:00-10:00 p.m. shift on August 20, 2007, he took armory keys from the L-5 control booth, went to the armory, and removed an EBID.  (ECF No. 37 at ¶34).  On the pretense of securing a television for Keehn's use, he then went with Keehn and another inmate to the property room on the second level of D-Pod, a room lacking a security camera, where he used the EBID against Keehn.  (Id. at ¶ 36).  He states that did this at Keehn's request, so that Keehn could settle an argument with his cellmate regarding the physical effect of an EBID.  (ECF No. 38 Ex. 6 at 25-26).  Lucas testified at his deposition that afterward, he gave Plaintiff a television so that 'maybe he wouldn't say anything.'  (Id. at 26)."  See Memorandum and Order (Doc. # 44), at 5 n. 5.

Chipikitis will testify that he was not aware of the incident until after Keehn had reported that he had been assaulted over one week later.  He will testify that he went to the property room on August 20, 2007, but did not see an EBID in the property room and did not see anyone use an EBID against Keehn.   Chipikitas believed that Elstner and Lucas were doing inmate property, and at one point believed that they were providing Keehn with a loaner television.

Elstner will testify that Lucas asked him if there was a television available for an inmate and that he answered in the affirmative and agreed to meet Lucas up in the property room.  Elstner then went to the property room and encountered Lucas, Keehn and another inmate.  Elstner will testify that although he was present in the property room at the time Lucas used the

EBID against Keehn, he did not know in advance that Lucas was going to use the EBID against

Keehn and that he did not pay attention to what was going on because he did not want to be

involved.  He will further testify that Keehn appeared to be a willing participant and that Keehn

did not complain or seek assistance from him.

## II.  STANDARD OF REVIEW

An extensive discussion of the appropriate standard of review over evidentiary questions

raised by means of a motion *in limine* has been recently provided by the court in <u>Univac Dental</u>

<u>Co. v. Dentsply Intern., Inc.</u>, 268 F.R.D. 190 (M.D.Pa. 2010):

> In considering motions *in limine* which call upon the Court to
> engage in preliminary evidentiary rulings under Rule 403 of the
> Federal Rules of Evidence, we begin by recognizing that these
> 'evidentiary rulings [on motions *in limine* ] are subject to the trial
> judge's discretion and are therefore reviewed only for abuse of
> discretion ...  Additionally, application of the balancing test under
> Federal Rule of Evidence 403 will not be disturbed unless it is
> "arbitrary and irrational."'  <u>Abrams v. Lightolier Inc.</u>, 50 F.3d
> 1204, 1213 (3d Cir. 1995)(citations omitted); <u>see</u> <u>Bernardsville Bd.</u>
> <u>of Educ. v. J.H.</u>, 42 F.3d 149, 161 (3d Cir. 1994)(reviewing *in*
> *limine* rulings for abuse of discretion).  Yet, while these decisions
> regarding the exclusion of evidence rest in the sound discretion of
> the district court, and will not be disturbed absent an abuse of that
> discretion, the exercise of that discretion is guided by certain basic
> principles.
>
> One of the key guiding principles is reflected is the philosophy
> which shapes the rules of evidence.  The Federal Rules of
> Evidence can aptly be characterized as evidentiary rules of
> inclusion, which are designed to broadly permit fact-finders to
> consider pertinent factual information while searching for the truth.
> The inclusionary quality of the rules, and their permissive attitude
> towards the admission of evidence, is embodied in three cardinal
> concepts.  The first of these concepts is Rule 401's definition of
> relevant evidence.  Rule 401 defines what is relevant in an
> expansive fashion, stating:
>
> > "Relevant evidence" means evidence having any tendency to
> > make the existence of any fact that is of consequence to the

determination of the action more probable or less probable
than it would be without the evidence.

Fed.R.Evid., Rule 401.

Adopting this broad view of relevance it has been held that:
'Under [Rule] 401, evidence is relevant if it has "any tendency to
make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it
would be without the evidence." [Therefore] "It follows that
evidence is irrelevant only when it has no tendency to prove the
fact.  Thus the rule, while giving judges great freedom to admit
evidence, diminishes substantially their authority to exclude
evidence as irrelevant."' Frank v. County of Hudson, 924 F.Supp.
620, 626 (D.N.J. 1996) citing Spain v. Gallegos, 26 F.3d 439, 452
(3d Cir. 1994)(quotations omitted).

This quality of inclusion embraced by the Federal Rules of
Evidence, favoring the admission of potentially probative proof in
all of its forms, is further buttressed by Rule 402, which generally
defines the admissibility of relevant evidence in sweeping terms,
providing that:

> All relevant evidence is admissible, except as otherwise
> provided by the Constitution of the United States, by Act of
> Congress, by these rules, or by other rules prescribed by the
> Supreme Court pursuant to statutory authority. Evidence
> which is not relevant is not admissible.

Fed.R.Evid., Rule 402.

Thus, Rule 402 expressly provides that all '[r]elevant evidence
will be admissible unless the rules of evidence provide to the
contrary.' United States v. Sriyuth, 98 F.3d 739, 745 (3d Cir.
1996)(citations omitted).
While these principles favoring inclusion of evidence are subject
to some reasonable limitations, even those limitations are cast in
terms which clearly favors admission of relevant evidence over
preclusion of proof in federal proceedings.  Thus, Rule 403, which
provides grounds for exclusion of some evidence, describes these
grounds for exclusion as an exception to the general rule favoring
admission of relevant evidence, stating that:

> Although relevant, evidence may be excluded if its probative
> value is substantially outweighed by the danger of unfair
> prejudice, confusion of the issues, or misleading the jury, or

by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

F.R. Evid., Rule 403 (emphasis added).

By permitting the exclusion of relevant evidence only when its probative value is "substantially outweighed" by other prejudicial factors, Rule 403 underscores the principle that, while evidentiary rulings rest in the sound discretion of the court, that discretion should consistently be exercised in a fashion which resolves all doubts in favor of the admission of relevant proof in a proceeding, unless the relevance of that proof is substantially outweighed by some other factors which caution against admission.

These broad principles favoring the admission of relevant evidence also shape and define the scope of this Court's discretion in addressing motions *in limine* like those filed by Dentsply here, which seek a pre-trial ruling excluding such evidence on relevance and prejudice grounds. In the past the United States Court of Appeals for the Third Circuit has cautioned against such preliminary and wholesale exclusion of evidence, noting that it has 'made clear that rulings excluding evidence on Rule 403 grounds should rarely be made *in limine*.' Walden v. Georgia-Pacific Corp., 126 F.3d 506, 518 n. 10 (3d Cir. 1997). The reason for this caution is evident: oftentimes a court 'cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence.' Id.; see also In re Diet Drugs Products Liability Litigation, 369 F.3d 293, 314 (3d Cir. 2004). As the Court of Appeals has observed when advising against excessive reliance on motions in limine to exclude evidence under Rule 403:

> [M]otions *in limine* often present issues for which final decision is best reserved for a specific trial situation. American Home, 753 F.2d at 324; cf. Luce v. United States, 469 U.S. 38, 41-42, 105 S.Ct. 460, 463-64, 83 L.Ed.2d 443 (1984)(holding that criminal defendant must testify to preserve claim of improper impeachment with prior conviction)("The [ *in limine* ] ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."). This is particularly true when the evidence is challenged as irrelevant or prejudicial; the considerations weighed by the

court will likely change as the trial progresses.   See
Rosenfeld v. Basquiat, 78 F.3d 84, 91 (2d Cir. 1996)
("Unlike rulings that involve balancing potential prejudice
against probative value, the ruling in the present case was not
fact-bound and no real purpose other than form would have
been served by a later objection.").  We have also made clear
that rulings excluding evidence on Rule 403 grounds should
rarely be made in limine.  '[A ] court cannot fairly ascertain
the potential relevance of evidence for Rule 403 purposes
until it has a full record relevant to the putatively
objectionable evidence.  We believe that Rule 403 is a trial-
oriented rule.  Precipitous Rule 403 determinations, before
the challenging party has had an opportunity to develop the
record, are therefore unfair and improper.'  Paoli I, 916 F.2d
at 859; see also In re Paoli R.R. Yard PCB Litig., 35 F.3d
717, 747 (3d Cir. 1994)("Paoli II").  Under these and similar
circumstances, if a district court makes a tentative pre-trial
ruling, it has the opportunity to 'reconsider [its] *in limine*
ruling with the benefit of having been witness to the
unfolding events at trial.'  United States v. Graves, 5 F.3d
1546, 1552 (5th Cir. 1993).

Walden, 126 F.3d at 518 n. 10.

   Thus, the principles which guide our consideration of motions in
limine that seek the exclusion of evidence on Rule 402 relevance
or Rule 403 undue prejudice grounds consistently urge that courts
to exercise their broad discretion sparingly in this field, and avoid
precipitous pre-trial rulings excluding evidence on these relevance
and prejudice grounds.

Univac Dental Co. v. Dentsply Intern., Inc., 268 F.R.D. at 196-198.

## III.  ARGUMENT

**A.  Insofar as it arises from testimony and evidence of the
Defendants' version of the underlying incident involved in
this case, evidence related to a consent defense is relevant
and its admission would not create unfair prejudice in the
minds of the jury.**

   Keehn seeks to "to preclude Defendants from examining witnesses, presenting testimony,

or introducing any other evidence at trial regarding Plaintiff's purported consent to the attack

made on him by Defendants."  See Motion *in Limine* (Doc. # 54), at 1.  In this case, although

6

there are some general areas of agreement between the parties in terms of times, dates and places, there are fundamental disagreements between the two sides in regard to what actually occurred in the RHU storage closet on August 20, 2007.  Cf. (Docs. # 37, 43) and (Doc. # 42-1). Keehn alleges that he was threatened with sexual assault and eventually physically assaulted by means of an EBID.  The Defendants contend that this was an ill-advised misadventure where Keehn was nevertheless a willing participant.  Yet, these disputes of material fact are why fact-finders are needed in our legal system.  It will be up to the fact-finder to determine what happened in the RHU storage closet on August 20, 2007.  However, in order to do so, they will need to know all relevant information from each respective witness about what they believe happened.

Keehn seeks to limit this information by excluding evidence of the Defendants' version of the event.  This is not appropriate for reasons that, initially, should appear obvious.  One accused of wrongdoing in a lawsuit should be given the opportunity to explain their side of the story, even if it is subsequently determined that there conduct is not legally defensible under the circumstances.

Further, even reviewing the question in the terms asserted by Keehn, the evidence should be admissible.  Keehn first argues that the evidence should be excluded as irrelevant pursuant to Fed. R.Evid. 401, 402 and 403.  Rule 401 defines the term "relevant evidence" while Rule 402 essentially states that "[a]ll relevant evidence is admissible" and [e]vidence which is not relevant is not admissible."  See Fed. R.Evid. 401-402.  Rule 403 requires the court to balance the probative value of a piece of evidence or testimony against any prejudicial impact it may have. See Fed. R.Evid. 403.

> Evidence is relevant, and generally admissible, if it has 'any tendency to make the existence of any fact that is of consequence

to the determination of [an] action more probable or less probable than it would be without the evidence.' Fed.R.Evid. 401; see Fed.R.Evid. 402; cf. Huddleston v. United States, 485 U.S. 681, 687, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)(noting the "broad principle that relevant evidence ... is admissible unless the [Federal] Rules [of Evidence] provide otherwise"); Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 109-10 (3d Cir. 1999) ("Rule 401 does not raise a high standard."). This definition of "relevant evidence" must be 'construed to secure fairness ... to the end that the truth may be ascertained and proceedings justly determined.' Fed.R.Evid. 102.

Pelzer v. City of Philadelphia, 2011 WL 93054, *4 (E.D.Pa. 2011).

Initially, the evidence at issue should be admitted simply based on the discussion of the proper scope of review of a motion *in limine* and the exercise of judicial discretion in such matters as set forth above. See Univac Dental Co. v. Dentsply Intern., Inc., 268 F.R.D. 190, 196-198 (M.D.Pa. 2010)(indicating that "courts [should] exercise their broad discretion sparingly in this field, and avoid precipitous pre-trial rulings excluding evidence on these relevance and prejudice grounds"). Nevertheless, by way of a more complete response to Keehn's motion *in limine*, the Corrections Defendants would offer the following argument in the alternative:

Keehn's claims are brought, *inter alia*, under the Eighth Amendment. The Eighth Amendment has been construed as the source of an inmate's claim for excessive force. See Graham v. Connor, 490 U.S. 386, 392-394 (1989)(use of force against convicted individuals is examined under Eighth Amendment's proscription against cruel and unusual punishment). Further, in Hudson v. McMillian, 503 U.S. 1, 4, (1992), the Court held that "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." Cf. Wilkins v. Gaddy, ___ U.S. ___, ___, 130 S.Ct. 1175, 1178-1179 (2010)("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability

to pursue an excessive force claim merely because he has the good fortune to escape without serious injury").

The teachings of Hudson are reflected in the Third Circuit's decisions in Brooks v. Kyler, 204 F.3d 102 (3d Cir. 2000) and Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002).  Accordingly, the Third Circuit has instructed that

> the pivotal inquiry in reviewing an inmate's § 1983 claim for excessive force is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'  Brooks, 204 F.3d at 106, *citing* Hudson, 503 U.S. at 7, 112 S.Ct. 995.  However, injuries are only one of several factors that a court must consider in answering that question.
>
> In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response.
>
> Brooks, 204 F.3d at 106, *citing* Hudson, 503 U.S. at 7, 112 S.Ct. 995.

Smith v. Mensinger, 293 F.3d at 649.

More pointedly, in Pabon v. State Correctional Officer Lemaster, 2008 WL 1830500 (W.D.Pa. 2008), this Court observed that in order "to establish an Eighth Amendment excessive force claim, the court *focuses* in *on the subjective good faith of the corrections officers* and not on the question under the Fourth Amendment of the objective reasonableness of the use of force." Id., at *4 (emphasis added).  However, any inquiry into the "subjective good faith of the corrections officers" is directed to the issue of whether the corrections officers specifically

intended to apply force "maliciously and sadistically to cause harm."  See Brooks v. Kyler, 204 F.3d at 106 (citing Hudson v. McMillian, 503 U.S. at 7).

Initially, "[t]he fact that prison authorities employ the use of[, *inter alia*,] taser guns does not, in and of itself, allege a violation of the Eighth Amendment."  See  Brown v. Beard, 2011 WL 1085890, *15 (W.D.Pa. 2011)(citing Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004); Jasper v. Thalacker, 999 F.2d 353, 354 (8th Cir. 1993); Caldwell v. Moore, 968 F.2d 595, 602 (6th Cir. 1992); Michenfelder v. Sumner, 860 F.2d 328, 336 (9th Cir. 1988)).

Thus, the reasons for the application of force are relevant, particularly where the subjective intent of the corrections officers is essentially determinative of the issue of whether a violation of the Eighth Amendment occurred *vel non*.  See Pabon v. State Correctional Officer Lemaster, supra.  However, these reasons are not limited to Keehn's view of the case.  Rather, each side must be permitted to present evidence on the reasons for the force used.

In this case, it is the Defendants' position that the force was used in an ill-considered experiment to determine Keehn's reaction to the effects of an EBID and in which Keehn was a willing participant.  Critically, it is the Defendants' claim that the EBID was not used in this instance "maliciously and sadistically to cause harm."  See, e.g., Lucas Dep. (Doc. # 38-6), at 80-90, 175-176.  While this may not necessarily justify the use of force as a matter of law, it is certainly an issue for the jury to determine as a matter of fact.  See, e.g., Prokey v. Watkins, 942 F.2d 67, 73 (1st Cir. 1991)("factual dispute must be resolved by a fact finder").  Indeed, as Judge Aldisert has cogently stated:  "It is the province of the fact finder –the jury, the judge in non-jury cases, or the administrative agency– to 'find' the basic fact, or that part of an ultimate finding that rests on narrative or historical facts...."  Universal Minerals, Inc. v. C. A. Hughes & Co., 669 F.2d 98, 102 (3d Cir. 1981)(citations omitted).  Cf. Henry v. Purnell, 652 F.3d 524, 542 (4th Cir.

2011)(Davis, C.J., *concurring*)(where it was observed in Fourth Amendment excessive force case where officer mistakenly pulled firearm instead of taser and shot fleeing suspect that "*genuine disputes of material historical and inferential facts absolutely surround the issue of the reasonableness of Deputy Purnell's mistake*, and a jury of his peers is the proper factfinder as to the ultimate question").

Pelzer v. City of Philadelphia, supra, was a Fourth Amendment excessive force case wherein the defendant police officer sought to preclude the admission of evidence that the decedent was unarmed at the time he was fatally shot.  Of course, in a Fourth Amendment excessive force case "the ultimate question is whether the use of force was '"objectively reasonable" in light of the facts and circumstances confronting' [the officer] at the time.  'The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  See Pelzer v. City of Philadelphia, 2011 WL 93054, at *4 (citing Graham v. Connor, 490 U.S. 386, 396-397 (1989); Mines v. City of Philadelphia, 1995 WL 82515, *3 (E.D.Pa. 1995)).[1]  As the Pelzer court then observed in that context,

> [t]his standard makes 'allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of

---

[1] Further, as the Third Circuit has observed, the question in a claim of excessive force under the Fourth Amendment  is "whether *under the totality of the circumstances* the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations."  See Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004) (internal citations omitted).   While Eighth Amendment jurisprudence does not expressly incorporate a "totality of the circumstances" approach, courts are advised that "[a] variety of factors are considered to determine if an application of force was applied maliciously and sadistically. … Consideration of these factors permits a court to make inferences concerning whether the use of force could plausibly have been thought necessary or whether the circumstances show such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  See, e.g., Delker v. Blaker, 2011 WL 2601962, *3 (W.D.Pa. 2011)(citations and internal quotations omitted).

> force that is necessary in a particular situation.' Id. at 396-97. *It does not, however, prevent a plaintiff or a fact finder from questioning whether the officer's account of the circumstances surrounding a use of force is credible, or from critically assessing whether the officer's beliefs and perceptions leading to the use of force were reasonable.* See id. at 398 n. 12 (noting an officer's subjective motives may be relevant to an assessment of his credibility, even though such motives are generally irrelevant to an 'objective reasonableness' inquiry); Sherrod v. Berry, 856 F.2d 802, 806 (7th Cir. 1988)(*en banc*)(suggesting an officer's claim he shot a suspect after seeing an object resembling a gun could be challenged with evidence showing no such object was found).

Pelzer v. City of Philadelphia, 2011 WL 93054, at *4 (emphasis added).

Thus, based on the reasoning expressed in Pelzer, evidence of the Defendants' version of the underlying incident in this case is relevant to the issue of whether excessive force was used. Indeed, it is argued that, similarly, the Eighth Amendment standard for excessive force does not prevent the Defendants from questioning whether Keehn's account of the circumstances surrounding the use of force is credible, or preclude the factfinder from critically assessing Keehn's account of the events when compared to the account offered by the Defendants.

This would seem especially true when Keehn's version of the incident is considered. Notably, Keehn refutes the Defendants' recitation and specifically denies that he consented to the use of the EBID. Keehn instead asserts that he was threatened with sexual abuse if he did not submit to the use of the EBID. Thus, the Defendants' testimony and evidence regarding Keehn's purported consent goes directly to Keehn's credibility, which is always relevant. Cf. Young v. AT&T Transition Protection Payment Plan, 1989 WL 81738, *2 (D.N.J. 1989)("given the particular factual scenario at issue, the result largely will turn on the credibility of the various individuals involved; if [the plaintiff's] version appears genuine while that of [the defendant's witnesses] appears to be contrived, plaintiff likely will be successful on his [ ] claim"); Jones v. Gardels, 2006 WL 37039, *2 (D.Del. 2006)("From a review of the [summary judgment] record,

the Court cannot conclude that the evidence is so one-sided that a reasonable jury could not find for Keehn. Here, where the parties' versions of the facts are so widely divergent, the decision as to which version is closer to the truth hinges on the credibility of the parties, their witnesses, and their evidence. Determination of credibility is a jury function")(citation omitted).

Indeed, in the instant circumstances, the Defendants' version of the incident is just as relevant as Keehn's version. The jury must ultimately determine what the facts are before they can apply the relevant law –pursuant to the Court's instructions– to those facts. In order to do so, they must be presented with all of the facts which having bearing on the issue. In this case, that would include the Defendants' version of the incident.

Keehn's claims that this evidence would be prejudicial to Keehn or confusing to the jury are equally unavailing.

> Relevant evidence 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ....' Fed.R.Evid. 403. Where a party objects to the presentation of evidence under Rule 403, the trial court has broad discretion to perform the necessary balancing test and determine admissibility. See Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008); United States v. Vosburgh, 602 F.3d 512, 537 (3d Cir. 2010); United States v. Balter, 91 F.3d 427, 442 (3d Cir. 1996).

Pelzer v. City of Philadelphia, 2011 WL 93054, at *6.

Moreover, "[a]s the Third Circuit has recognized, evidence is not properly excluded under Rule 403 simply because it is prejudicial, or detrimental to a party's case. Rule 403 is only concerned with unfair prejudice, which arises when evidence is likely to 'cause a jury to base its decision on something other than the established propositions in the case.'" See Pelzer v. City of Philadelphia, 2011 WL 93054, at *6 n. 8 (citing Carter v. Hewitt, 617 F.2d 961, 972, n. 14 (3d Cir. 1980)(internal quotations omitted)).

Keehn provides no argument in his brief beyond the simple *ipse dixit* proposition that "[t]he evidence related to [Plaintiff's] purported consent will only serve to distract the jury from [it's evaluation of the evidence related to the Defendants' actions], inappropriately shift the focus onto [Plaintiff's] actions, and create unfair prejudice against [Plaintiff], who has the burden of proof." See Brief in Support of Motion *in Limine* (Doc. # 55), at 10.  Keehn does not describe how the introduction of the Defendants' version of the incident would cause unfair prejudice or inexorably lead the jury to credit the Defendants' version of the event over his.

Yet, as asserted above, both Keehn's and the Defendants' versions of the incident are relevant and should be offered for the jury's consideration.  No "unfair prejudice" would arise from the introduction of evidence that Keehn consented to the use of the EBID against him in this case, nor would the introduction of a competing version of events be confusing to the jury.  Juries are often charged with assessing the credibility of competing witnesses and weighing the probative value of contradictory pieces of evidence whenever there are material facts that must be resolved.  Indeed, it is the nature of our adversarial system of justice.  Thus, because there is nothing unusual about the evidence that would be introduced in this case that would cause unfair prejudice or be confusing to a jury, the evidence should be admitted.

> **B.  Contrary to Plaintiff's assertions, consent remains a defense in Pennsylvania to tort claims of both assault and battery.**

In the next section, Keehn argues that "[t]he consent defense is barred in both criminal and civil common law for offenses involving bodily injury, in circumstances such as those presented here." See Brief in Support of Motion *in Limine* (Doc. # 55), at 11-16.  However, initially, the cases cited by Keehn in support of this proposition are not from Pennsylvania, and the proposition advanced by Keehn does not appear to be consistent with Pennsylvania law.

At Count V of his Amended Complaint, Keehn brings a claim of Assault and Battery based on the asserted conduct and actions of Defendants Lucas and Chipikitas.  See Amended Complaint (Doc. # 17), at ¶¶ 141-143.  Keehn also asserts a claim of Intentional Infliction of Emotional Distress against all three remaining defendants at Count VI of his Amended Complaint.

Initially, however, under Pennsylvania law, it appears that consent is an affirmative defense to both assault and battery.  See, e.g., Harris v. Paige, 2011 WL 1755646, *10 (E.D.Pa. 2011)("Consent is a defense to the intentional torts of assault and battery")(citing Levenson v. Souser, 557 A.2d 1081, 1088 (Pa.Super. 1989); Restatement (Second) Torts § 892A)).  See also Zeglen v. Miller, 2007 WL 5005243, *3-*4 (M.D.Pa. 2007) and Nardella v. Dattilo (No.2), 36 Pa. D. & C.4th 364, 370 (Dauphin Co. 1997).  Indeed, as this Court has noted,

> Consent is a defense to the intentional torts of assault and battery. W. Prosser, Law on Torts § 18 (4th ed. 1971).  Consent may be manifested by an individual's words and/or affirmative actions which indicate a willingness for another's conduct to occur. Consent also may be indicated by inaction which indicates to another an implied or apparent willingness for conduct to occur. Restatement (Second) Torts § 892, comment b and c (1979).  In effect, the individual's actions speak louder than words.  Prosser, Law on Torts § 18.

Quinn v. Limited Exp., Inc., 715 F.Supp. 127, 130 (W.D.Pa. 1989).

Interestingly for purposes of this case, the plaintiff in Quinn asserted a cause of action for assault and battery on the basis that she submitted to an employer requested polygraph.  The plaintiff argued that as an employee of a business she was statutorily protected from being compelled to submit to a polygraph test and thus could not validly consent to a polygraph test. In its analysis, the Court focused on the issue of whether the plaintiff had actually consented to be polygraphed:  "At issue is whether plaintiff consented to the administration of the polygraph.

… Our focus, therefore, is on the plaintiff's actions at the time the polygraph was administered. If the plaintiff consented to the administration of the polygraph, then there can be no claim for assault and battery." Quinn v. Limited Exp., Inc., 715 F.Supp. 129-130.  The Court ultimately concluded that the evidence on the issue supported a finding that the plaintiff had consented to the polygraph and therefore there was no assault and battery.  Thus, even though the plaintiff in Quinn was arguably in a protected status, the court nevertheless focused its inquiry on the factual determination of the plaintiff's consent.

Prosser's words were later echoed by the Third Circuit in a case where, *inter alia*, a claim of intentional exposure to a hazardous substance on behalf of a purported class of over one million Pennsylvania cigarette smokers was made against several tobacco companies:

> Under Pennsylvania law, the tort of intentional exposure to hazardous substances is predicated on a theory of battery.  See Field v. Philadelphia Elec. Co., 388 Pa.Super. 400, 565 A.2d 1170, 1178 (Pa.Super. 1989).  *Plaintiffs must prove as a constituent element they did not consent to the tortious conduct.*  See Levenson v. Souser, 384 Pa.Super. 132, 557 A.2d 1081, 1088 (Pa.Super. 1989); Prosser & Keeton § 18, at 113 ("Consent avoids recovery simply because it destroys the wrongfulness of the conduct as between the consenting parties, however harmful it might be to the interests of others."); Restatement (Second) Torts § 892A ("One who effectively consents to the conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for the harm resulting from it.")  Express consent may be given by words or affirmative conduct and implied consent may be manifested when a person takes no action, indicating an apparent willingness for the conduct to occur.   Restatement (Second) Torts § 892 cmt. b & c.  The consent must be to the "defendant's conduct, rather than to its consequences." Prosser & Keeton § 18, at 118. A plaintiff's consent is not effective if "the consenting person was mistaken about the nature and quality of the invasion intended by the conduct."  Prosser & Keeton § 18, at 114.

Barnes v. American Tobacco Co., 161 F.3d 127, 147-148 (3d Cir. 1998)(emphasis added).

The decision of the Superior Court of Pennsylvania in <u>Hutchison ex rel. Hutchison v.</u> <u>Luddy</u>, 763 A.2d 826 (Pa.Super. 2000), is also instructive.   Therein, the parent of a minor brought suit against a priest who allegedly molested the minor as well as the priest's church, bishop, and diocese.   Part of the case concerned two instances where the minor travelled back to Pennsylvania in order to meet the priest in a motel to have sex, for which he was paid.   The defense was permitted to "introduce[] evidence that would support a conclusion that the incidents in 1983 and 1984 were initiated by [the minor] and that he consented to the incidents to obtain money from [the priest]" and make arguments to the jury on this issue.   <u>Id.</u>, 763 A.2d at 849.   Although the court did not follow the defense's proposed instructions, the jury was charged on the impact of the minor's consent to his claim.   <u>Id.</u>, 763 A.2d at 850.

On appeal, the Superior Court found no error in the trial court's decision to deny the specific charge submitted by the defense, concluding that the charge that was given adequately explained the applicable law to the jury.   In so doing, the Superior Court endorsed the trial court's explanation for its decision:

> [we] told the jury that this Plaintiff could not recover in a sex-for-money scenario if the jury were to conclude that is what occurred. The possibility that what occurred in the Townhouse Motel on one or both occasions was an act of prostitution was one possible interpretation that the jury might reach based on all the testimony. Accordingly, we believe [that the] Church Defendants were entitled to have this possible interpretation put before the jury in the manner stated above on this issue. This was well[-]argued in closing arguments by all sides, and we supported it by the charge.

<u>Hutchison ex rel. Hutchison v. Luddy</u>, 763 A.2d at 850.

Finally, perhaps even more compelling are the circumstances in <u>Harris v. Paige</u>, <u>supra</u>.   In that case, an on-duty police officer was charged with sexually assaulting an individual he had encountered during a traffic stop.   At the summary judgment stage of the proceedings, the court

denied the officer's summary judgment motion, stating that "[b]ecause the issue of consent is obviously a jury issue in this case, we deny [the officer's] request for summary judgment on [the plaintiff's] claim for assault and battery." Harris v. Paige, 2011 WL 1755646, at *10.  Many of the same concerns presented by Keehn herein were involved in Harris v. Paige.  The defendant was a law enforcement officer, on the night in question he was in uniform and on duty; the defendant encountered the plaintiff in the course of a purported traffic stop.  The plaintiff alleges that the defendant gave him orders which he followed and resulted in the defendant sexually assaulting the plaintiff.[2]   See Harris v. Paige, 2011 WL 1755646, at *1-*2.   Nevertheless, it appears that the issue of the plaintiff's consent was relevant to the determination of the defendant's liability on the assault and battery charge.  Id., at *10.  Accordingly, applying this same approach herein, it would appear that the issue of Keehn's consent is relevant to and admissible on the determination of the Defendants' liability on the battery charge.

> **C.   While the consent defense is not available in some cases where the victim belongs to a class of people for whom special protection is afforded by law, there is no special protection for inmates as a class where consent to sexual relations is not implicated.  Moreover, even where the issue of an inmate's consent arises in the context of sexual activity between inmates and their custodians, the general consensus is that there is no *per se* violation of the Eighth Amendment and the issue of consent should be determined on a case-by-case basis.**

At Section C of his Brief, Keehn argues that a consent defense "is not available in cases where the victim belongs to a class of people for whom special protection is afforded by law." See Brief in Support of Motion *in Limine* (Doc. # 55), at § C.  Keehn specifically asserts that "Legislatures have expressed the will of society that harms against particular classes of people or

---

[2] In his defense, the defendant asserted that the sexual assaults did not occur, or that if they did occur, they were consensual.  See Harris v. Paige, 2011 WL 1755646, at *10.

arising from particular conduct will not be tolerated, despite the existence of consent." Id., at 17. However, the legislative expressions relied upon by Keehn concern sexual encounters and medical experimentation, Id., at 17-18.   Indeed, neither Congress nor the Pennsylvania General Assembly have specifically identified prisoners as a protected class when it comes to offenses involving assault or bodily harm.

Instantly, the Defendants are not asserting that Keehn consented to a sexual act.   Thus, the analysis proffered by Keehn is unavailing.   Nevertheless, because courts have permitted the issue of consent to be raised in Eighth Amendment cases involving sexual activity, it would seem that the issue of consent is properly raised in Eighth Amendment case involving non-sexual activity such as is at issue herein.

Keehn also seeks to rely on C.C.H. v. Philadelphia Phillies, Inc., 940 A.2d 336, 350 (Pa. 2008), for the exclusion of evidence of his consent in this case.   In C.C.H., the supreme court was presented with the question "whether the criminal preclusion of the defense of consent should be extended to cases where, as here, a civil plaintiff under the age of 13 is seeking damages for injuries caused by sexual contact." Id., at 347.   The court answered in the affirmative, "conclud[ing] that, where the victim is a minor less than 13 years of age, evidence of the victim's consent to sexual contact, like in criminal proceedings, is not an available defense in determining civil liability for such contact." Id.

However, Keehn's efforts to incorporate this holding in the present case are unavailing. In C.C.H. v. Philadelphia Phillies, Inc., the court relied on a particular statutory provision in the Pennsylvania Crimes Code which specifically precluded the defense of consent where the victim was under the age of 13.   The Crimes Code contains no corollary provision which specifically precludes the defense of consent where the victim is a person in custody.   Moreover, as admitted

by Keehn, while there are laws that treat inmates as a protected group with respect to certain sexual conduct, there is no such statutory protection for inmates against assault and battery. <u>See</u> Brief in Support of Motion *in Limine* (Doc. # 55), at 23 ("there is no explicit statute enacted by the Pennsylvania legislature or by Congress forbidding guards to use excessive force on inmates"). Thus, <u>C.C.H.</u> does not apply here and, as argued above, evidence on the issue of Keehn's purported consent should be admitted for the jury's consideration.

Further, as noted by Chief Justice Castille in dissent,

> the policies that led the General Assembly to criminalize sexual contact with a minor under 13 irrespective of the minor's consent are inapt in this civil setting. While the criminal justice system reflects larger societal concerns, and aims to punish and deter wrongful conduct, <u>see</u> 18 Pa.C.S. § 104 and <u>Commonwealth v. Church</u>, 513 Pa. 534, 522 A.2d 30, 36 (1987), the civil tort system offers the prospect of a private remedy, in the form of monetary compensation to individuals injured by another to make them whole. <u>See Trosky v. Civil Service Comm'n</u>, 539 Pa. 356, 652 A.2d 813, 817 (1995). These fundamental differences between a criminal prosecution on the one hand and a tort action on the other would cause me to refrain from importing the bar on the issue of consent in the former to the latter. I believe that justice would be better served in the present case if appellees, from whom compensatory damages were sought, were properly afforded the opportunity to establish that the minor, who sought those damages from them, had the capacity to consent and did in fact consent to the events that she claims injured her. <u>See</u> Restatement (Second) of Torts § 892A ("One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it. To be effective, consent must be (a) by one who has the capacity to consent or by a person empowered to consent for him, and (b) to the particular conduct, or to substantially the same conduct.").

<u>C.C.H. v. Philadelphia Phillies, Inc.</u>, 940 A.2d at 350 (Castille, C.J., *dissenting*).

Notwithstanding that the Chief Justice was writing in dissent in <u>C.C.H. v. Philadelphia Phillies, Inc.</u>, these words would seem to clearly apply in the instant case where Keehn is seeking monetary compensation from the Defendants, who should be afforded the opportunity to

establish that Keehn, "had the capacity to consent and did in fact consent to the events that []he claims injured h[im]." Id.

Finally, in Section D of his Brief, Keehn relies on the 1999 decision in Carrigan v. Davis, 70 F.Supp.2d 448 (D.Del. 1999), to assert that "a prisoner cannot waive his or her constitutional rights in the context of a custodial relationship." See Brief in Support of Motion in Limine (Doc. # 55), at   (citing Carrigan, 70 F.Supp.2d at 461).   In Carrigan, a female inmate brought constitutional claims against a corrections officer, alleging that the corrections officer "violated her Fourth, Eighth and Fourteenth Amendment rights and acted with gross and wanton negligence, when he sexually assaulted her while she was incarcerated[.  The corrections officer] admits that he engaged in a sexual act with the Plaintiff, but [ ] contends that the Plaintiff consented to the act."  Carrigan v. Davis, 70 F.Supp.2d at 450.  The case proceeded to a trial by jury where both sides were apparently able to present their evidence.  The court granted a Rule 50 motion[3] made by the plaintiff and directed a verdict against the defendant corrections officer on the issue of liability, having "concluded that under the circumstances of this case, [the defendant corrections officer] could not assert the Plaintiff's alleged consent as a defense to the claimed constitutional violations."  Id.

Initially, it appears that the Carrigan court *permitted* the defendant corrections officer to introduce evidence in support of his defense that the sexual relationship with the plaintiff inmate was consensual.  Thus, Carrigan does not support the proposition Keehn seeks to advance in his present motion in limine, which is "to preclude Defendants from examining witnesses, presenting

---

[3]  See Fed. R.Civ. P. 50(a).  After the Court's granted the plaintiff's Rule 50(a) motion, "the Plaintiff voluntarily dismissed her state law claims and the jury was instructed on the remaining issues of proximate cause and damages.  The jury returned a verdict awarding the Plaintiff $10,000 in punitive damages and nothing in compensatory damages."  See Carrigan v. Davis, 70 F.Supp.2d at 451.

testimony, or introducing any other evidence at trial regarding Plaintiff's purported consent to the attack made on him by Defendants." See Motion *in Limine* (Doc. # 54), at 1.

In fact, quite to the contrary, the court determined that the appropriate inquiry was whether the plaintiff inmate had made a valid waiver of her rights, thus clearly establishing the relevance of evidence on the question of consent. See Carrigan v. Davis, 70 F.Supp.2d at 459 (wherein court "proceed[ed] to examine whether, the Plaintiff's purported consent established by [the defendant corrections officer's] testimony, *which the Court accepts as true*, is legally sufficient to establish a waiver by the Plaintiff of her civil rights")(emphasis added). Although the court ultimately "conclude[d], as a matter of law, that [the defendant corrections officer] cannot establish a voluntary, knowing and intelligent waiver by the Plaintiff," it did so only after a consideration of "the circumstances of the instant case, *and after fully crediting the Defendant's version of the March 6, 1995 incident.*" See Carrigan v. Davis, 70 F.Supp.2d at 459 (emphasis added).

Thus, despite the particular finding in that case, Carrigan seems to follow the general consensus that the issue of consent in the prison context should be made on a case-by-case basis upon consideration of all relevant evidence, including the defendant's version of the events.[4] Indeed, it appears that the issue of consent in these cases should be considered on a case-by-case basis, rather than as a *per se* rule that any sexual contact between inmate and guard constitutes a

---

[4] There appears to exist a view that Carrigan v. Davis stands for the proposition that acts of vaginal intercourse and/or fellatio between a prison inmate and a prison guard, whether consensual or not, establish a *per se* violation of the Eighth Amendment. See, e.g., Doe v. Cunningham, 2007 WL 990141, * (W.D.Va. 2007)(citing Carrigan v. Davis for proposition that "any sex with inmates *per se* violation of Eighth Amendment"); Cash v. County of Erie, 2009 WL 3199558, *2 (W.D.N.Y. 2009)(same). However, a careful reading of the decision in Carrigan v. Davis, supra, would appear to dispel that conclusion and instead require that a searching *factual* inquiry be made into the issue of waiver or consent. Indeed, this proposition has not been sustained even within that district. See, e.g., Phillips v. Bird, 2003 WL 22953175, *2 (D.Del. 2003).

violation of the Eighth Amendment.   See Grager v. Schudar, 770 N.W.2d 692 (N.D. 2009),

McGregor v. Jarvis, 2010 WL 3724133 (N.D.N.Y. 2010) and Chao v. Ballista, 772 F.Supp.2d

337 (D.Mass. 2011).  Of course, such an approach necessarily requires an examination of all of

the evidence, including that of the defendants to establish the plaintiff's purported consent.

In Grager v. Schudar, 770 N.W.2d 692 (N.D. 2009), the court was reviewing the

propriety of a jury charge which instructed that "One who consents to or participates in the

conduct of another cannot recover in an action for the conduct or for the harm resulting from it."

Id., at 695.  The court reviewed case law from other jurisdictions and considered common law

tort principles as well as relevant statutory enactments in that state and ruled as follows:

> [c]onstruing our comparative fault statutes in conjunction with our
> criminal statutes and N.D.C.C. § 31–11–05(6), we conclude an
> adult prisoner's apparent consent to or participation in sexual
> conduct with a jailer imposes neither absolute liability on the jailer
> nor a complete bar to the prisoner's recovery in a civil action
> premised upon the sexual conduct.  When the statutory provisions
> for comparative fault are considered together with N.D.C.C. §§
> 12.1–20–06, 12.1–20–07, 25–03.3–01(9)(a)(6) and 31–11–05(6),
> and the Restatement (2nd) of Torts § 892C, we believe those
> provisions preclude consent as a complete defense to a civil action
> for damages, but do not prevent a trier-of-fact from considering
> consent in allocating fault or determining the existence and extent
> of damages.  We conclude that when consent to a sexual act by a
> person in official custody or detained in a treatment facility, prison,
> or other institution is at issue in a situation where the actor has
> supervisory authority, disciplinary control or care over the detained
> person, the jury must be instructed that it must consider all of the
> factors limiting the detained person's ability to control the situation
> or to give consent in deciding whether the detained person
> effectively consented to the sexual act.  Each case must be decided
> on its own factual circumstances, including the age, sex, mental
> capacity, and relative positions of the parties.

Grager v. Schudar, 770 N.W.2d at 698.

Similarly, in McGregor v. Jarvis, 2010 WL 3724133 (N.D.N.Y. 2010), an inmate brought

an Eighth Amendment claim based on a sexual relationship with a female corrections officer.

The defendants moved for summary judgment and the court observed that, viewing the "uncontested material facts in a light most favorable to Plaintiff[ as] the non-movant, it appears by all accounts that his sexual relationship with [the corrections officer] was consensual." Id., at *10. The court granted summary judgment to the defendants, but initially observed that,

> [o]bviously, corrections officers maintain a position of authority over inmates and implicit in such relationship is an unbalanced playing field with regard to choice. And, it is true that, for criminal prosecution purposes, an inmate is incapable under New York law to consent in sexual relations. However, we do not accept the assertion that an acknowledgment of the veracity of these two statements automatically translates into an acknowledgment of constitutional effrontery. In Boddie, the Second Circuit was careful to announce the rule that 'sexual abuse may violate contemporary standards of decency' and 'may meet both the subjective and the objective elements' of the Eighth Amendment test. Boddie v. Schnieder, 105 F.3d [857,] at 861 [(2nd Cir. 1997)](emphasis added). The Circuit did not hold, as a matter of law, that all sexual contact is violative of the Eighth Amendment, and instead requires a case-by-case analysis of the relevant facts to determine whether the acts complained of are "objectively, sufficiently serious." Id.

McGregor v. Jarvis, 2010 WL 3724133, at *9.

In granting summary judgment, the McGregor court conducted an extensive analysis of Eighth Amendment jurisprudence involving sexual conduct between guards and inmates and concluded that "[a]fter reviewing the caselaw, we join the general consensus in noting that any sexual contact between a prison guard and an inmate is inappropriate and serves no legitimate penological purpose. However, we find that the facts in this case do not rise to the level of an Eighth Amendment violation in that the conduct at issue, though inappropriate, is not objectively sufficiently serious and did not cause pain as contemplated by that Amendment." See McGregor v. Jarvis, 2010 WL 3724133, at *11.

Finally, in <u>Chao v. Ballista</u>, 772 F.Supp.2d 337 (D.Mass. 2011), an inmate asserted an Eighth Amendment claim against a corrections officer and prison officials on the basis of an ongoing sexual relationship with the corrections officer.  The defendants moved for summary judgment, claiming that the relationship was consensual.  Although the court denied the defendants' motion for summary judgment, the court determined that the nature of the relationship and its consequences were questions of fact for the factfinder.  Said the court,

> a relationship between an inmate and a guard is presumptively coercive.  Each of the so-called indicators of consent emphasized by defendants could as well mean the opposite; …. And the relationship necessarily risks serious psychological harm to the inmate– particularly where female inmates tend to be especially vulnerable to abuse.  It surely may cause the kind of serious harm envisioned by the Eighth Amendment no matter how rosy its veneer.  But the issue on summary judgment is not an abstraction. Whether the relationship was *coercive in this case*, whether it caused constitutional harm *to this plaintiff* is a matter for a fact-finder, not for a judge.

<u>Chao v. Ballista</u>, 772 F.Supp.2d at 342.  <u>See</u> <u>also</u> <u>Chao v. Ballista</u>, 772 F.Supp.2d at 350-351 ("Whether or not these relationships [between guards and inmates] are truly 'consensual' cannot be found –or rejected– as a matter of law.  There is enough about the prison environment –and this case in particular– that requires a trial").

Moreover, after a careful and searching review of the relevant caselaw, the court ultimately concluded as follows: "I will not say that consensual sex is *never* an Eighth Amendment violation, nor will I say that it is *always* one."  <u>See</u> <u>Chao v. Ballista</u>, 772 F.Supp.2d at 348-351.  This same approach would appear appropriate in the instant case.  Whether Keehn agreed to involve himself in the incident with the EBID and consented to the use of the EBID against him is –in the first instance– a question of fact to be determined by the jury upon consideration of all of the evidence.  It is then incumbent upon the jury to determine the

consequence of that action within the context of the Eighth Amendment.  Nevertheless, because the question of consent is one for the jury as the finder of fact in this case, all evidence on that issue becomes relevant and admissible, including the Defendants' evidence that Keehn willingly involved himself in this misadventure and consented to have the EBID used on him.

Indeed, as asserted earlier, because courts have permitted the issue of consent to be raised in Eighth Amendment cases involving sexual activity, it would seem that the issue of consent is properly raised in Eighth Amendment cases involving non-sexual activity such as are at issue herein.  Accordingly, based on the foregoing, the Defendants should be permitted to introduce testimony and evidence to the effect that Keehn was a willing participant in the incident that occurred in the RHU property room on August 20, 2007, and it is a matter for the jury to determine what actually transpired between the parties that day.

## IV.  CONCLUSION

WHEREFORE, the Corrections Defendants respectfully request that the Court deny the Plaintiff's Motion *in Limine* to Preclude Defendants from Asserting a Consent Defense at Trial.

Respectfully submitted,

LINDA L. KELLY
Attorney General


_____s/ Scott A. Bradley_____

Office of Attorney General
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 565-3586
Fax:    (412) 565-3019

Scott A. Bradley
Senior Deputy Attorney General
Attorney I.D. No. 44627

Gregory R. Neuhauser
Chief Deputy Attorney General

Date:  November 22, 2011