IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GERALD KEEHN, ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. 09-16 |
| ) | Magistrate Judge Maureen P. Kelly |
| C/O LUCAS; C/O CHIPIKITAS; C/O ) | |
| ELSTNER; FORMER SUPERINTENDENT) | |
| HARRY E. WILSON; CAPTAIN ) | |
| McCOMBIE; LT. TKACS. SGT. HOGAN; ) | |
| C. SHAFFER, Control Sgt.; C/O ) | |
| DELBRIDGE, ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Plaintiff Gerald Keehn has filed a Motion in Limine to Preclude Defendants from Introducing any Evidence or Testimony at Trial Related to an Asserted Consent Defense (the "Motion in Limine"). [ECF No. 54]. The Motion in Limine relates to Plaintiff's alleged consent to an assault with an Electronic Body Immobilization Device ("EBID"). Defendants have filed responses in opposition to the Motion in Limine, contending that the evidence at issue is directly relevant to their defense to Plaintiff's action. [ECF Nos. 56, 57]. For the reasons set forth below, Plaintiff's Motion in Limine is granted and the parties are directed that evidence of alleged consent to the EBID assault is not admissible at trial.

**I. BACKGROUND**

Plaintiff filed suit alleging, inter alia, violations of his Eighth Amendment rights under 42 U.S.C. § 1983, for the excessive use of force in an incident that Defendants have admittedly characterized as an "ill-considered experiment," "innocent horseplay," and "an ill-advised misadventure." [ECF No. 57, p.6; ECF No. 56, pp. 7, 10]. Plaintiff alleges that on August 20,

1

2007, he was incarcerated in Administrative Custody ("AC") status in the L-Unit, C-Pod, Restricted Housing Unit ("RHU") at the State Correctional Institution in Fayette County, Pennsylvania ("SCI-Fayette"). He was assigned to AC at his own request because a confrontation with other inmates in the prison's general population left him in fear for his well-being. At the time, Defendants Lucas, Chipikitis and Elstner were Pennsylvania Department of Corrections ("DOC") corrections officers assigned to Plaintiff's housing unit.

About a month prior to the incident, Plaintiff became a block worker for J-Block, performing work seven days per week under the supervision of corrections officers. [ECF No. 38 Ex. 5 at 11]. He spent most of each day out of his cell performing duties including cleaning, packing essentials for other inmates, and handling request slips and grievances. [Id. at 10, 11, 12]. Plaintiff alleges that two days prior to the events at issue, he asked Defendant Elstner if he could borrow a television, because the one in his cell was "on the fritz." [Id. at 14]. Plaintiff contends that in the evening of August 20, 2010, when he returned to his cell on L-Block after finishing his work on J- Block, the following events transpired:

> I came back in with the other block worker. Lucas stopped me by the sergeant's bubble and said, do you want to borrow a TV? I said yeah. He said wait here. He goes into the control room. He's in there maybe a minute, two minutes, comes back out and says, follow me. We walked around his right side. He goes in the armory and says, stay here. I stood there at the armory. He was gone maybe another minute, two minutes. He comes back out. He says, follow me.
> 
> We went to D Pod where we met up with CO Elstner and the other block worker . . . We went upstairs on D Pod. We went in the back room. CO Lucas asked Elstner if he had the keys to the [property room] door. Elstner opened up the door for us. We went in, and we was asking if he had the TV. We looked for the TV. It wasn't in that room. So Elstner and [the other block worker] left. They came back in with the TV.
> 
> Elstner set the TV up on the desk. We're trying to get it to work. . . . I asked CO Elstner, are we done, and he said yeah. Then CO Lucas said, well, not yet. He said either I was going to give them all a blow job or get tasered . . . And I looked at him. I was like, tasered? And he pulled the taser out of his pocket. And I go, I'm

2

cool. I'm good. I go to walk out of the room, and CO Chipikitas was walking in as I was about to leave. And he's like, where are you going, convict? And he started to laugh. I was like, I'm out of here. He pushed me back in the room. When he pushed me back, CO Lucas grabbed the back of my jumpsuit that I had tied around and pushed me over to the wall.

And from what I could see Chipikitas was on my left side; Lucas was on my right. And Chipikitas had his arm on my left side holding me against the wall. Lucas had his left hand on my shoulder, and I got tasered.

(Id. at 12-13). The transcript of Plaintiff's deposition then reflects the following exchange:

Q. Do you know how many times?

A. Three

Q. On your right? Chipikitas was on your-

A. Left.

Q. – left? And they were holding you against the wall?

A. Wall.

Q. As they were holding you that's when you were struck with the EBID?

A. Well, Lucas let go of me when he tasered me, but Chipikitas still had a hold of me on my left side. And he jumped back, and Lucas tasered me two more times.

Q. And then what happened?

A. After the third time I fell to the floor. I got up, and I lost control of my bowels and I urinated on myself. They laughed. As I was walking toward the desk because there's [a] chair at the desk, I went to sit down, and Lucas hands me the TV and said, keep your mouth shut, thanks for participating in our little experiment.

Q. Then what happened?

A. Elstner left. Lucas left. Me - - not Elstner, but Chipikitas and Lucas left first. There's me, Elstner and [the other inmate] left. I picked the TV up, walked outside on the catwalk and went to my cell. [Id. at 13].

3

The next day, Plaintiff completed a sick call slip stating that he had been tasered by guards, and that the resulting welts appeared to be infected. [Id. at 14]. On August 22, a physician's assistant examined him through the door of his cell, stating that the welts did not seem to be infected and were healing. [Id. at 15]. Plaintiff then wrote a letter to the then Superintendent of SCI-Fayette, Harry E. Wilson, and filed a grievance. Two lieutenants visited Plaintiff three or four days after the examination by the physician's assistant, and a nurse photographed the marks on Plaintiff's right side. [Id. at 16].

According to Defendant Lucas, during the 2:00 p.m. - 10:00 p.m. shift on August 20, 2007, he took armory keys from the L-5 control booth, went to the armory, and removed an EBID. [ECF No. 37 at ¶34]. On the pretense of securing a television for Plaintiff's use, he then went with Plaintiff and another inmate to the property room on the second level of D-Pod, a room lacking a security camera, where he used the EBID against Plaintiff. [Id. at ¶ 36]. Lucas states that he did this at Plaintiff's request, so that Plaintiff could settle an argument with his cellmate regarding the physical effect of an EBID. [ECF No. 38 Ex. 6 at 25-26]. Lucas testified at his deposition that afterward, he gave Plaintiff a television so that "maybe he wouldn't say anything." [Id. at 26]. Defendant Elstner contends that he was present when Lucas used the EBID on Plaintiff, but believed that Plaintiff was a willing participant. [ECF No. 43 at ¶ 19]. Defendant Chipikitas testified at his deposition that he did not enter the room until the incident was over. [Id. at ¶ 14].

Defendant Lucas ultimately was terminated from his position, and faced criminal charges.[1] While the ultimate disposition of his charges is contested by the parties, Lucas consented to participation in an Accelerated Rehabilitation Program to resolve the charges

---

[1] Defendant Lucas was returned to work as the result of a grievance filed by his union.

against him. [ECF No. 17, ECF No. 55-1, ECF No. 57 p. 16]. Defendant Elstner received a single day suspension for failing to report the incident. Defendant Chipikitis was not disciplined.

**II. DISCUSSION**

**A. Legal Standard**

The purpose of a motion in limine is to avoid injecting into trial matters which are irrelevant, inadmissible, and prejudicial. Emcore Corp. v. Optium Corp., Civ. No. 07–326, 2009 U.S. Dist. LEXIS 96305, *2-3 (W.D.Pa. Oct. 16, 2009) (quoting Black's Law Dictionary 1013 (6th ed.1990)). Otherwise stated, motions in limine narrow the evidentiary issues for trial and eliminate unnecessary trial interruptions. Id. at *3 (quoting Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069 (3d Cir.1990)).

Under Rule 401 of the Federal Rules of Evidence, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed.R.Evid. 401. Rule 402 provides that "[r]elevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court. Irrelevant evidence is not admissible." Fed.R.Evid. 402. Plaintiff contends that because consent is not an available defense to either his Eighth Amendment or his common law assault and battery claims, evidence tending to establish consent is not of consequence and therefore irrelevant and inadmissible.

**B. Consent is Irrelevant to Plaintiff's Eighth Amendment Claim.**

Plaintiff seeks to exclude evidence of his alleged consent to the use of the EBID on the basis that it is irrelevant to his Eighth Amendment claim. Defendants do not proffer any security

interest to be served by the activation of the EBID and, in their characterization of the incident, concede that the use of force against Plaintiff was a "misadventure" or "horseplay." Plaintiff contends that in the absence of a legitimate penological interest for using the EBID, Defendants' conduct was wanton and malicious, and a *per se* violation of the "cruel and unusual punishment" clause of the Eighth Amendment. Plaintiff further argues that as a matter of constitutional law and public policy, consent is not an available defense to wanton and malicious conduct, making purported consent irrelevant to his Eighth Amendment claim.

Defendants counter that consent is relevant to the subjective good faith of the corrections officers not to cause harm and to aid in the determination of the ultimate issue, to wit, whether the EBID was used "maliciously and sadistically to cause harm." [ECF No. 56 p. 10]. Defendant Lucas contends that consent is relevant to a determination of whether the use of force was mere "horseplay" and therefore not "incompatible with contemporary standards of decency." [ECF No. 57, p. 4]. Defendant Lucas also posits that Plaintiff's alleged consent is relevant to a determination of whether Defendants acted "with the requisite deliberate indifference or reckless disregard" to support an Eighth Amendment claim. Id.

**1. Standard to Measure the Use of Force**

> The language of the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted," manifests "an intention to limit the power of those entrusted with the criminal-law function of government." Ingraham v. Wright, 430 U.S. 651, 664, 97 S. Ct. 1401, 1408, 51 L. Ed.2d 711 (1977). The Cruel and Unusual Punishments Clause "was designed to protect those convicted of crimes," ibid., and consequently the Clause applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." Id., at 671

Whitely v. Albers, 475 U.S. 312, 318-9 (1986). In Rhodes v. Chapman, 452 U.S. 337, 345-346 (1981), the United States Supreme Court held that with regard to the treatment of prisoners in the

custody of the state, the Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" which serves "no legitimate penological interest."

> The Eighth Amendment, in only three words, imposes the constitutional limitation upon punishments: they cannot be "cruel and unusual." The Court has interpreted these words "in a flexible and dynamic manner," <u>Gregg v. Georgia</u>, 428 U.S. 153, 171, 96 S. Ct. 2909, 2924, 49 L.Ed.2d 859 (1976) (joint opinion), and has extended the Amendment's reach beyond the barbarous physical punishments at issue in the Court's earliest cases. See <u>Wilkerson v. Utah</u>, 99 U.S. 130, 25 L. Ed. 345 (1879); <u>In re Kemmler</u>, 136 U.S. 436, 10 S. Ct. 930, 34 L. Ed. 519 (1890). Today the Eighth Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," <u>Gregg v. Georgia</u>, supra, at 173, 96 S. Ct., at 2925, or are grossly disproportionate to the severity of the crime, <u>Coker v. Georgia</u>, 433 U.S. 584, 592, 97 S. Ct. 2861, 2866, 53 L. Ed.2d 982 (1977) (plurality opinion); <u>Weems v. United States</u>, 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910). Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification." <u>Gregg v. Georgia</u>, supra, 428 U.S. at 183, 96 S. Ct. at 2929; <u>Estelle v. Gamble</u>, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed.2d 251 (1976).

<u>Rhodes v. Chapman</u>, 452 U.S. 337, 345-346 (1981). Certainly, courts extend wide ranging deference to the judgment and policies of prison officials who must maintain internal order and discipline in the prisons and who must often make snap decisions in volatile and dangerous situations. <u>Hudson v. McMillian</u>, 503 U.S. 1, 6 (1992). Officials balance the threats presented by prison unrest to prison workers, inmates and administrators "against the harm inmates may suffer if guards use force." Id. Because of the competing concerns often facing prison authorities, the standard to measure the propriety of the use of force in all cases alleging an excessive use of force is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." <u>Whitley v. Albers</u>, 475 U.S. 312, 320 (1986).

Where "an effort to maintain or restore discipline" is the proffered reason for the use of force, then and only then is an examination of the "good faith" of the official and the reasonableness undertaken:

7

> The test for whether a claim of excessive force is constitutionally actionable is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L.Ed.2d 251 (1986). The relevant factors for a court to consider are (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. Id. see also Brooks [v. Kyler, 204 F.3d 102, 109 (3d Cir. 2000)].

Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009). However, in the absence of any legitimate need for force, the use of force is *per se* a violation of the Eighth Amendment.

In Hope v. Pelzer, the United States Supreme Court held that where a prisoner does not present a current risk or threat of harm, yet is handcuffed to a hitching post in the full sun for seven hours and left to soil himself as punishment for an earlier altercation, the state has committed an "obvious" Eighth Amendment violation because the pain inflicted serves no legitimate penological interest. Hope v. Pelzer, 536 U.S. 730, 737-8 (2002).[2] Similarly, where a guard discharges pepper spray into a tier of cells "as a practical joke," the application of force is not warranted at all, and constitutes a violation of the Eighth Amendment:

> Where no legitimate penological purpose can be inferred from a prison employee's alleged conduct …, the conduct itself constitutes sufficient evidence that force was used 'maliciously and sadistically for the very purpose of causing harm.'" Giron v. Corrections Corp. of Am., 191 F.3d 1281, 1290 (1oth Cir. 1999) (quoting Whitley, 475 U.S. at 320-21, 106 S. Ct. 1078). We will not require inmates to be subjected to the malicious whims of prison guards. See Hudson v. McMillan, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed.2d 156 (1992) ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident.").

DeSpain v. Uphoff, 264 F.3d 965, 978 (10th Cir. 2011).

---

[2] Hope v. Pelzer, supra, concerned allegations of cruel and unusual "conditions of confinement," in contrast to the cruel and unusual "excessive use of force" alleged here. However, with regard to *all* Eighth Amendment claims, the United States Supreme Court has made clear that the gratuitous infliction of "wanton and unnecessary" pain is "clearly" prohibited. Id., 536 U.S. at 738.

8

Here, Defendants' characterization of the event as "an ill-considered experiment," "an ill-advised misadventure," and "innocent horseplay" suffices to make clear that no legitimate penological interest was served by the use of the EBID device.[3] Defendants' unequivocal concessions make clear that as to the "ultimate issue," no risk of harm was present when the EBID was used to shock Plaintiff in a storage closet, hidden from the view of any camera.

It cannot reasonably be disputed that the use of an EBID constitutes a "use of force." "As the Supreme Court has said, pain, not injury, is the barometer by which we measure claims of excessive force … and one need not have personally endured a taser jolt to know the pain that must accompany it. '[A] stun gun inflicts a painful and frightening blow [that] temporarily paralyzes the large muscles of the body, rendering the victim helpless.'" Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009) (citations omitted). Defendants' use of the EBID, whether once or three times, resulted in burn marks and the loss of control of bodily functions, leaving Plaintiff to suffer the additional humiliation of soiling himself.

---

[3] Defendants' failure to proffer any security interest and unequivocal concession that the use of force was "horseplay" and/or an "ill-advised misadventure" makes clear that no legitimate penological interest was served when the EBID was activated and Plaintiff sustained his injuries. These concessions are binding as judicial admissions, rendering the "ultimate issue" of the absence of a legitimate penological interest in the use of the EBID resolved.

> Judicial admissions are concessions in pleadings or briefs that bind the party who makes them. See Parilla v. IAP Worldwide Serv., VI, Inc., 368 F.3d 269, 275 (3d Cir. 2004) (finding that the plaintiff was bound because she "expressly conceded those facts in her complaint.") (citing, inter alia, Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997) (noting the "well-settled rule that a party is bound by what it states in its pleadings"); Glick v. White Motor Co., 458 F.2d 1287, 1291 (3d Cir. 1972) (noting that unequivocal "judicial admissions are binding for the purpose of the case in which the admissions are made[,] including appeals")). See also Karkoukli's, Inc. v. Dohany, 409 F.3d 279, 283 (6th Cir. 2005) (finding that the plaintiff's "admissions of statutory compliance by defendants in its briefs" constituted "'judicial admissions' that estop [plaintiff] from raising a statutory non-compliance argument in this appeal.") (citation omitted); Gospel Missions of America v. City of Los Angeles, 328 F.3d 548, 557 (9th Cir. 2003) (stating that court of appeals has discretion whether to treat a concession in a pleading or brief as a binding judicial admission).

Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 211 (3d Cir. 2006).

Defendants have failed to support the notion that "consent" to his injuries serves a legitimate penological interest. This completes the inquiry, rendering evidence of consent irrelevant to the "ultimate issue." As in DeSpain, supra, in the *admitted* absence of any legitimate penological interest, Defendants' use of the EBID constitutes sufficient evidence, as a matter of law, that the force used was excessive, malicious and sadistic, on a whim for the very purpose of causing harm and, therefore, unconstitutional.

**2. Evidence of Plaintiff's Consent is Not Relevant to Any Asserted Defense.**

Defendants posit that evidence of Plaintiff's consent is relevant to a determination of (1) whether Defendants subjectively intended to cause harm, (2) the application of "good faith immunity" and, (3) as with certain other rights arising under the constitution, as a defense to the violation itself. These arguments are readily disposed of.

**a. Subjective Intent**

As set forth *supra*, in the *admitted* absence of any stated public safety purpose for the use of the EBID, Defendants' conduct constitutes a *per se* violation of the Eighth Amendment and violates contemporary standards of decency. See Brooks v. Kyler, 204 F.3d 102 (3d Cir. 2000). Simply stated, examination of subjective intent is limited to whether the use of force is in furtherance of an emergent and legitimate penological interest. Whitley, supra. Where it is conceded that no legitimate penological interest exists, inquiry into whether Defendants subjectively intended to cause harm is not probative and, indeed, unnecessary. In such instances, "we may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." Hope v. Pelzer, 536 U.S. at 738.

Defendants cite Pabon v. State Correctional Officer Lemaster, No. 07-805, 2007 WL 1830500 (W.D. Pa. 2008), for the proposition that an excessive use of force claim requires an

10

examination of the Defendants' subjective intent to cause harm, rendering evidence of Plaintiff's consent relevant. However, in Pabon, the defendant correctional officer had not conceded the absence of any legitimate penological interest with regard to the use of force and so the defendant's subjective state of mind was relevant. Here, Defendant Lucas has testified that he was helping Plaintiff "settle an argument" as to the physical effects of an EBID. [ECF No. 38, Ex. 6 at 25-26]. It is clear that no "legitimate penological interest" was served and, as such, inquiry into his state of mind is irrelevant. Defendants' subjective intent to cause harm wantonly and maliciously may be inferred as a matter of law. Hope v. Pelzer, 536 U.S. at 738.

### b. Good Faith Immunity

Defendants contend that evidence of consent is relevant to the application of "good faith immunity" as a complete defense to Plaintiff's suit. Generally, "government officials are immune from suit in their individual capacities unless, 'taken in the light most favorable to the party asserting the injury, … the facts alleged show the officer's conduct violated a constitutional right' and 'the right was clearly established at the time of the objectionable conduct.' … For a right to be clearly established, '[t]he contours of the rights must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Giles v. Kearney, 571 F.3d 318, 324 (3d Cir. 2009).

In Giles, the United States Court of Appeals for the Third Circuit reversed the grant of summary judgment to prison officials on the issue of immunity. The Court of Appeals held as a matter of law that by the year 2001, "it was established that an officer may not kick or otherwise use ***gratuitous*** force against an inmate who has been subdued." Id. at 326-27 (emphasis added). The Court of Appeals further held that the ***gratuitous*** use of force absent a threat of harm is a

11

situation "that a reasonable officer would have known was a violation [of the Eighth Amendment] under the circumstances." Id.

Here, there is no dispute that at the time the EBID was activated, Plaintiff did not present a risk or threat of harm necessitating the use of force. Defendants' subjective belief as to the propriety of their conduct is therefore irrelevant because, as a matter of law, a reasonable officer should have known (as of 2001) that the *gratuitous* use of force on a "subdued, nonresisting inmate" was a violation of the Eighth Amendment. Id. at 327.[4] Qualified immunity under these circumstances is not available as a defense, and evidence of Plaintiff's purported consent is irrelevant.

---

[4] Additionally, Defendants can be charged with knowledge of the express policies of the Department of Corrections, which clearly delineate when the use of force is appropriate:

It is the policy of the Department that:

A. Use of force against an inmate is authorized when the acting staff member reasonably believes such force is necessary to accomplish any of the following objectives:
   1. protection of self or others;
   2. protection of property from damage or destruction;
   3. prevention of an escape;
   4. recapture of an escapee;
   5. prevention of an act of crime;
   6. effect compliance with the rules and regulations when other methods of control are ineffective or insufficient; and/or
   7. protection of the inmate from self-inflicted harm.

B. When force is used, the least amount of force the staff member reasonably believes is necessary to achieve the authorized purpose is to be used and the use of force will stop once control is achieved.

DC-ADM 201.

### c. Waiver

Defendant Lucas contends that the Eighth Amendment right against cruel and unusual punishment can be waived by consent. For this proposition, Defendant Lucas cites inapposite case law dealing with consensual sexual relationships between guards and inmates. Defendant Lucas misstates that Stubbs v. DeRose, No. 03-2362, 2007 WL 776789 (M.D. Pa. 2007), an unreported decision of the United States District Court for the Middle District of Pennsylvania, is the law of the "Third Circuit," and contends "the legal defense of consent as it applies to claims of excessive force under the Eighth Amendment has already been recognized in the Third Circuit." [ECF No. 57, p. 6].

Stubbs involved a five year affair between a prison chaplain and an inmate, where there was "no evidence of record that [Defendant's] conduct caused Plaintiff any pain or other injury." As an initial matter, Stubbs is not an "excessive force" case, but a "conditions of confinement" case. The allegations at issue did not involve the use of force, but the impropriety of a long-term sexual relationship between a prison chaplain and an inmate that continued after the inmate had been released from prison. As recognized by the District Court, "an inmate who brings an action under 42 U.S.C. § 1983, alleging sexual assault or related claims, is generally alleging a violation of the conditions of confinement under the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 847 (1994)." Id. Accordingly, a different standard applies to determine whether the conduct at issue constitutes a violation of the Eighth Amendment:

> [w]hat is necessary to establish an "unnecessary and wanton infliction of pain," we said, varies according to the nature of the alleged constitutional violation. 475 U.S. at 320, 106 S. Ct. at 1085. For example, the appropriate inquiry when an inmate alleges that prison officials failed to attend to serious medical needs is whether the officials exhibited "deliberate indifference." See Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed.2d 251 (1976). This standard is appropriate because the State's responsibility to provide inmates with medical

13

> care ordinarily does not conflict with competing administrative concerns. Whitley, supra, 475 U.S. at 320, 106 S. Ct. at 1084-1085.
>
> By contrast, officials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force. Despite the weight of these competing concerns, corrections officials must make their decisions "in haste, under pressure, and frequently without the luxury of a second chance." 475 U.S. at 320, 106 S. Ct. at 1084. We accordingly concluded in Whitley that application of the deliberate indifference standard is inappropriate when authorities use force to put down a prison disturbance. Instead, "the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " Id., at 320-321, 106 S. Ct., at 1085 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (CA2), cert. denied sub nom. John v. Johnson, 414 U.S. 1033, 94 S. Ct. 462, 38 L. Ed.2d 324 (1973)).

Hudson v. McMillian, 503 U.S. 1, 5-6 (1992). The "unnecessary and wanton infliction of pain" standard has been extended to all excessive force claims, and the inquiry is initially limited to the existence of a legitimate penological interest. See, Hudson v. McMillan, 503 U.S. at 7 ("we hold that whenever prison officials stand accused of using excessive force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"). Accordingly, there is no inquiry into whether Defendants were deliberately indifferent, or whether Defendants intended to cause pain, or whether Defendants considered Plaintiff's purported consent to physical pain a reasonable request. If the claim is excessive use of force, the only relevant inquiry is whether there is a legitimate penological interest to be served. Where it is conceded no legitimate penological interest exists, the inquiry is at an end.

As to whether a prisoner in the custody of the state can consent to the intentional infliction of pain, the United States Supreme Court has unequivocally held that gratuitous

violence, serving no legitimate penological interest, is a violation of "the basic concept underlying the Eighth Amendment[, which] is nothing less than the dignity of man." Hope v. Pelzer, 536 U.S. at 738. Moreover, it is clear that prison officials have a duty to protect prisoners from violence, especially in those situations where it is known that harm will result.

> When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. See Youngberg v. Romeo, supra, 457 U.S., at 317 ("When a person is institutionalized--and wholly dependent on the State[,] ... a duty to provide certain services and care does exist"). The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. See Estelle v. Gamble, supra, 429 U.S., at 103-104; Youngberg v. Romeo, supra, 457 U.S., at 315-316. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. See Estelle v. Gamble, supra, 429 U.S., at 103 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met").

DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989) (footnote deleted). The notion that an inmate in the custody of the state can consent or waive the right to be safe from certain gratuitous physical harm is inimical to Defendants' duty to protect him. In conjunction with an absolute prohibition against the use of force in the absence of a legitimate penological interest, consent to harm, simply, is untenable in contemporary society.

**C. Consent is irrelevant to Plaintiff's common law claim for assault and battery.**

Plaintiff contends that consent is unavailable as a defense to his common law assault and battery claim. The Court agrees. Pennsylvania law recognizes the custodial relationship between guard and prisoner, and imposes a duty of protection owed by a guard to a prisoner in

15

his care. In this context, the Legislature has delineated when a correctional officer's use of force is justified:

> § 509. Use of force by persons with special responsibility for care, discipline or safety of others.
>
> The use of force upon or toward the person of another is justifiable if:
>
> \* \* \*
>
> (5) The actor is a warden or other authorized official of a correctional institution; and:
>
> i. he believes that the force used is necessary for the purpose of enforcing the lawful rules or procedures of the institution, unless his belief in the lawfulness of the rule or procedure sought to be enforced is erroneous and his error is due to ignorance or mistake as to the provisions of this title, any other provision of the criminal law or the law governing the administration of the institution;
> ii. the nature or degree of force used is not forbidden by law; and
> iii. if deadly force is used, its use is otherwise justifiable under this chapter.

18 Pa. C.S.A. § 509(5). With these limitations, the Pennsylvania Legislature has clearly stated the policy of the Commonwealth such that when a guard, who is charged with "special responsibility for [the] care, discipline or safety of others," uses force, the force must be used in the furtherance of enforcing the lawful rules or procedures of the institution. Defendant's "ill-advised misadventure" does not meet this threshold and, notably, consent is not a permitted justification to use force, especially an EBID.

In promulgating the "use of force" provisions, the Pennsylvania Legislature has identified prisoners as individuals to whom a "special responsibility" is owed. This recognition of the dependency of inmates on guards is further evidenced by the Legislature's enactment of the Institutional Sexual Assault Statute, 18 Pa. C.S.A. § 3124.2, which renders it a felony for a guard to have sexual relations with an inmate. In Commonwealth v. Mayfield, 832 A.2d 418 (Pa. 2003), a corrections officer convicted under Section 3124.2 for her "consensual" sexual relations

16

with three inmates challenged the statute on Fourteenth Amendment "freedom of association" grounds. The Pennsylvania Supreme Court upheld the statute, citing the state interest in protecting inmates from an inherently coercive relationship:

> Sexual contact between correctional staff and inmates is obviously rife with the possibility of coercion, both subtle and overt, given the extensive power guards exercise over inmates. Furthermore, public correctional institutions can in no way be likened to that "most private of places, the home." Lawrence, at *16. While the state interest in regulating private consensual sex between adults is low, see Commonwealth v. Bonadio, 490 Pa. 91, 415 A.2d 47, 50 (1980) (finding no state interest sufficient to justify prohibition of voluntary deviate sexual intercourse), in the setting of a correctional institution the calculus of interests is fundamentally different.
>
> In such a setting, the state interest in maintaining institutional order and discipline is high, and the interest of the individual is necessarily limited. The United States Supreme Court noted this essential difference in Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974):
>
>> We have recognized, however, that the relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private citizen, and that the internal problems of state prisons involve issues ... peculiarly within state authority and expertise.
>
> Id., at 825-26, 94 S. Ct. 2800 (quotation marks omitted). The Commonwealth has an undeniable interest in ensuring the "relationship of state prisoners and the state officers who supervise their confinement," id., as well as institutional order and discipline, is not undermined by sexual contact, consensual or otherwise. Therefore, we conclude § 3124.2 does not "punish [ ] a substantial amount of constitutionally-protected conduct." Hendrickson, at 317-18. Rather, the statute regulates "conduct [that] falls within the scope of otherwise valid criminal laws that reflect legitimate state interests." Id., at 318. Section 3124.2 is not unconstitutionally overbroad.

Com. v Mayfield, at 472-473. Given the inherent dependency an inmate has on his caretakers, and the "extensive power guards exercise over inmates," Pennsylvania has recognized that mutuality of consent within the confines of incarceration is not possible. This is especially so where, as here, the Plaintiff is in Administrative Custody. Because of this placement, without

17

the discretionary consent of the prison staff to work, Plaintiff would be confined to his cell for twenty-three hours per day.

The relevance of the Commonwealth's recognition of a prisoner's dependency on the officials charged with his care is made apparent by the Pennsylvania Supreme Court's decision in C.C.H. v. Philadelphia Phillies, Inc., 940 A.2d 336 (Pa. 2008). There, the Pennsylvania Supreme Court held that a civil defendant could not defeat a battery claim brought by a child under the age of 13 by contending that the child had consented to sexual activity. In so holding, the Pennsylvania Supreme Court relied on the fact that the criminal law had categorically classified children under the age of 13 as being "incompetent as a matter of law to consent to sexual contact." C.C.H., 940 A.2d at 349. The Supreme Court held that it was appropriate to define the applicable standard of conduct in civil tort matters by reference to criminal statutes:

> Upon consideration of the foregoing arguments and relevant case law, we conclude that, where the victim is a minor less than 13 years of age, evidence of the victim's consent to sexual contact, like in criminal proceedings, is not an available defense in determining civil liability for such contact.
>
> In reaching this conclusion, we note by way of background our decision in Congini v. Portersville Valve Co., 504 Pa. 157, 470 A.2d 515, 518 (1983), where we first articulated the duty of care owed by a social host to a minor guest where the minor is injured after imbibing alcoholic beverages provided by the host. See also Alumni Association, 572 A.2d at 1212. In Congini, we noted that Pennsylvania had previously adopted Restatement (Second) of Torts § 286 (1965), which provides that courts can define the standard of a "reasonable man" by adopting standards of conduct from legislative enactments designed to protect a class of individuals. Congini, 470 A.2d at 517-18. Taking guidance from the Restatement, we then looked to Section 6308 of the Crimes Code, 18 Pa.C.S. § 6308, which prohibits persons under 21 years of age from purchasing or consuming alcoholic beverages. Congini, 470 A.2d at 517-18. This Court interpreted this statute as reflecting a legislative determination that persons under 21 are incompetent to handle alcohol. Id. More importantly, we also determined that this provision reflected a legislative intent to protect minors as a class from the deleterious effects of consuming alcoholic beverages. In light of this legislative pronouncement, we adopted this standard as defining the duty of care owed by adults to minor guests, and held that adults who furnish alcohol to minors are negligent per se. Id. at 518. In so doing, this Court implicitly

18

> recognized that the standards set forth under the Crimes Code may sometimes
> have relevance in determining civil liability.

Id. at 347.

Here, taking the standards of conduct from legislative enactments designed to protect inmates from unauthorized physical contact in an inherently coercive setting and adopting them in the civil tort arena, it is clear that consent to assault and battery is not a defense to Plaintiff's common law tort claim. Indeed, if an inmate is incapable of consent to all sexual contact, pleasurable as well as not pleasurable, it is inherently contradictory to hold that an inmate is capable to consent to harmful and painful contact by an EBID that serves no legitimate penological interest. Accordingly, because under the circumstances presented here, consent is not a defense to Plaintiff's common law tort claim, evidence of Plaintiff's consent is not relevant to any issue.

### D. Undue Prejudice and Jury Confusion.

Alternatively, Plaintiff contends that evidence of consent may mislead or confuse the jury as to the law to be applied to his Eighth Amendment claim and is unduly prejudicial. Pursuant to the balancing test of Rule 403, a court "may exclude *relevant* evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403. Here, because Defendants have conceded that no

legitimate penological interest was served when the EBID was activated, consent is irrelevant to any issue of consequence, and the issue of undue prejudice need not be reached.

## ORDER

**AND NOW**, to wit, this 30th day of January 2012, it is hereby **ORDERED** that as it pertains to Plaintiff's purported consent to the use of force, Plaintiff's Motion in Limine is **GRANTED** and evidence of such consent is precluded from trial.

BY THE COURT,

/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc: All Counsel or Record via CM/ECF